EDNA MORRIS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2752–66, 6478–67—6480–67, 6497–67. Filed October 2, 1972.

*Arnold Y. Kapiloff* and *Myles A. Cane*, for the petitioners.
*John J. O'Toole*, for the respondent.

QUEALY, *Judge*: These proceedings involve deficiencies in income taxes asserted against the petitioners, as follows:

---

[1] Cases of the following petitioners are consolidated herewith: Edna Morris Cohn, docket No. 6478–67; Sidney Cohn and Stella Cohn, docket No. 6479–67; Gateway Motor Inn, Inc., docket No. 6480–67; and Sidney Cohn, docket No. 6497–67.

| Docket Nos. | Petitioners | Taxable years | Income tax |
|---|---|---|---|
| 6480-67 | Gateway Motor Inn, Inc. | Jan. 31, 1962 | $5,155.70 |
| | | Jan. 31, 1963 | 3,159.37 |
| | | Jan. 31, 1964 | 2,925.03 |
| 2752-66 | Edna Morris, transferee of Palpar, Inc., transferor | Oct. 31, 1959 | 4,295.91 |
| | | Oct. 31, 1960 | 4,116.50 |
| | | Nov. 1, 1960, to May 3, 1961 | 59,512.61 |
| 6497-67 | Sidney Cohn, transferee of Palpar, Inc., transferor | Oct. 31, 1959 | 4,298.37 |
| | | Oct. 31, 1960 | 4,178.97 |
| | | Nov. 1, 1960, to May 3, 1961 | 59,504.07 |
| 6478-67 | Edna Morris Cohn | 1961 | 166,068.80 |
| 6479-67 | Sidney Cohn and Stella Cohn | 1961 | 19,769.10 |

After giving effect to various stipulations and concessions by the parties, the issues remaining for decision are as follows:

(1) In docket No. 6480-67, the basis of certain property in the hands of Gateway Motor Inn, Inc., for purposes of depreciation under section 167;[2]

(2) In docket Nos. 2752-66 and 6497-67, whether payments made to Palpar, Inc., on account of certain notes may be treated as a return of capital;

(3) In docket Nos. 6478-67 and 6479-67, whether Edna Morris and Sidney Cohn realized a taxable dividend as a result of the liquidation of Palpar, Inc., under section 333.

### FINDINGS OF FACT

The cases were consolidated for trial, briefing, and decision. Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Sidney Cohn (hereinafter referred to as Cohn) and Stella E. Cohn, husband and wife during 1961, timely filed with the district director of internal revenue, Newark, N.J., a joint individual Federal income tax return on a cash basis for the calendar year 1961. During 1961, Cohn and Stella E. Cohn resided at 45 Edgewood Street, Tenafly, N.J. On December 31, 1966, Cohn and Stella E. Cohn were divorced. At the time Cohn and Stella E. Cohn filed their petitions in this case, Cohn resided at 2 Dorchester Road, Englewood Cliffs, N.J., and Stella E. Cohn resided at Horizon Towers South, Horizon Road, Fort Lee, N.J.

Cohn was admitted as a member of the New Jersey Bar in 1927, was 66 years old on October 12, 1969, and has been actively engaged on a full-time basis in the practice of law in New Jersey since 1927 specializing in the real estate and real estate finance fields. Stella E.

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Cohn is retired and has not been gainfully employed for more than 30 years.

Edna Morris (hereinafter referred to as Morris) timely filed with the district director of internal revenue, Newark, N.J., an individual Federal income tax return on a cash basis for the calendar year 1961. Cohn and Morris were married on December 31, 1966. Morris was 55 years old on July 4, 1969. At the time Morris filed her petition in this case, she resided at 2 Dorchester Road, Englewood Cliffs, N.J.

Gateway Motor Inn, Inc. (hereinafter referred to as Gateway), is a New Jersey corporation organized on January 27, 1961. Gateway timely filed U.S. corporate income tax returns on an accrual basis with the district director of internal revenue, Newark, N.J., for its taxable years February 1, 1961, through January 31, 1962; February 1, 1962, through January 31, 1963; and February 1, 1963, through January 31, 1964. The principal office of Gateway is located at 105 State Highway S–3, Secaucus, N.J. 07094. Gateway maintained such principal office at the time it filed its petition in this case.

Palpar, Inc. (hereinafter referred to as Palpar), was a New Jersey corporation organized on November 19, 1958, with its principal office located at 232 Broad Avenue, Palisades Park, N.J. Palpar timely filed with the district director of internal revenue, Newark, N.J., U.S. corporate income tax returns on a cash basis for the taxable periods November 1, 1958, through October 31, 1959; November 1, 1959, through October 31, 1960; and for the period November 1, 1960, through May 3, 1961, filed its return on June 24, 1963. On May 3, 1961, Palpar was dissolved under New Jersey law and liquidated pursuant to section 333.

Lincoln Enterprises, Inc. (hereinafter referred to as Lincoln), was a New Jersey corporation organized in 1958 by Salvatore Vitiello (hereinafter referred to as Vitiello) for the purpose of promoting, constructing, owning, and operating a motel (hereinafter referred to as the motel) to be located on real estate to be leased by Lincoln at 105 State Highway S–3, Secaucus, N.J. 07094. Vitiello was the beneficial owner of all of the outstanding stock of Lincoln.

On May 9, 1958, Lincoln, as lessee, executed an agreement of lease (hereinafter referred to as the lease) with Eugene and Olive E. Mori and Joan G. and James W. Phillips (hereinafter referred to as the lessor), as lessor, for a term of 75 years with respect to a parcel of unimproved real estate (hereinafter referred to as the leasehold) located at 105 State Highway S–3, Secaucus, N.J. 07094. The lease, among other things, contemplated Lincoln immediately would construct and operate the motel on the leasehold.

The lease required Lincoln prior to commencing construction of the motel to produce for lessor a mortgage commitment in an amount which together with the amount of equity capital of Lincoln equaled at least the amount of a firm bid for the construction of the motel. The lease also provided that the lessor shall have the option to reenter the leased premises and terminate the lease if lessee shall default in the payment of rent or any other sum due under the lease or in the full, faithful, and punctual performance of any other covenant, agreement, provision, or condition on the part of lessee to be performed, or if any execution or attachment shall be issued against the lessee or any of lessee's property. In addition, the lease further provided that if a petition shall be filed, and the lessee shall thereafter be adjudicated bankrupt; or if such petition shall be approved by the court and a receiver or trustee for any portion or all of lessee's property shall be appointed, unless the rental herein reserved is then current and future payments are promptly paid when due, the lease shall, ipso facto, be terminated.

Vitiello thereupon contacted Michael Pollotta (hereinafter referred to as Pollotta) for the purpose of engaging him to act as general contractor to construct the motel. Pollotta had been engaged in the building contracting business for approximately 23 years. Pollotta and members of his family organized Mike-Pol Construction Co., Inc. (hereinafter referred to as Mike-Pol), a New Jersey corporation, in 1958 for the purpose of constructing the motel for Lincoln.

On August 27, 1958, Mike-Pol and Lincoln executed a contract for the construction by Mike-Pol of the motel for Lincoln for the sum of $305,000. Mike-Pol obtained security for the payment of the contract price in the form of an assignment of the lease and a pledge of the stock of Lincoln.

On August 27, 1958, as collateral security for the performance by Lincoln of its obligations to Mike-Pol under the contract, Lincoln assigned its rights in the lease to Mike-Pol. At the same time, by agreement the stockholders of Lincoln deposited the certificates representing all the outstanding stock of Lincoln and the officers and directors of Lincoln deposited their undated blank resignations in escrow with Cohn, as escrow agent.

Lincoln attempted to obtain permanent mortgage financing to pay for the construction of the motel but was not successful. In the absence of such financing, the lessor waived a provision of the lease requiring Lincoln, prior to commencing construction of the motel, to obtain equity capital and a mortgage commitment in an amount equal to the amount of a firm bid for the construction of the motel.

Lincoln was obligated to pay Mike-Pol $85,000 on August 29, 1958, as the first installment under the construction contract. Lincoln failed

to make this payment. By letter dated September 18, 1958, Mike-Pol advised Lincoln that Mike-Pol would not resume work on the motel until it received such payment. Mike-Pol and Lincoln thereupon executed an amendment to the construction contract increasing the amount due by the sum of $20,000, plus interest, as an additional charge for financing the construction cost, and Mike-Pol then resumed construction.

As a result of Lincoln's default in making the payments on account of the construction, a plan was developed for the purpose of financing such costs in the following manner:

(1) Cohn would organize a group to advance $130,000 in cash to Palpar in exchange for 65,000 shares of its common stock and $65,000 in interest-bearing notes.

(2) Mike-Pol would assign to Palpar $130,000 of the total amount due it from Lincoln on account of construction costs in exchange for 65,000 shares of common stock of Palpar and $65,000 in interest-bearing notes.

(3) Palpar would advance the sum of $260,000 consisting of $130,000 in cash to Lincoln and transfer to Lincoln credit for $130,000 to Lincoln's indebtedness previously acquired from Mike-Pol. In exchange, Lincoln would issue to Palpar non-interest-bearing notes in the amount of $416,000 payable at the rate of $1,000 per week for 99 weeks with the balance of $317,000 payable 1 week thereafter. These notes would be secured by a first mortgage on the leasehold and the improvements thereon.

(4) Lincoln would, in turn, discharge $260,000 due to Mike-Pol on account of the construction costs by a payment of $130,000 in cash and an offset of $130,000 of its indebtedness acquired from Palpar.

(5) Lincoln would issue to Mike-Pol on account of the excess of the construction costs over the sum of $260,000 a series of 156 non-interest-bearing notes in the aggregate amount of $184,000 repayable at the rate of $700 per week for 155 weeks with the balance of $75,500 payable 1 week thereafter. These notes would be secured by a mortgage constituting a second lien on the leasehold and improvements thereon.

Pursuant to plan, Palpar was duly organized on November 19, 1958. The officers of Palpar were: President, Michael Pollotta; secretary, George Fellman; and treasurer, Philip Garmain. Mike-Pol thereupon assigned to Palpar $130,000 of the total amount due it from Lincoln under the construction contract in exchange for 65,000 shares of common stock of Palpar and $65,000 in 2-year, 6-percent notes of Palpar. Cohn's group paid $130,000 in cash to Palpar in exchange for 65,000 shares of common stock of Palpar and $65,000 in 2-year, 6-percent notes of Palpar.

Pursuant to plan, on December 2, 1958, Lincoln and Palpar executed a purchase agreement pursuant to which Palpar agreed to lend to Lincoln the sum of $260,000. Simultaneously, Palpar executed an indenture of trust appointing Cohn as trustee for and on behalf of Palpar (Cohn as such trustee is referred to as trustee) in connection with all matters contemplated by the purchase agreement, authorized the trustee to enter into a loan agreement with Lincoln, and authorized the trustee to act with full authority on behalf of Palpar in connection with the purchase agreement and the loan agreement.

On December 2, 1958, Lincoln, its stockholders, officers, directors, and trustee executed a loan agreement pursuant to which Palpar advanced $130,000 in cash to Lincoln and refinanced or gave credit for $130,000 payable on the construction contract. In exchange, Lincoln delivered to Palpar the $416,000 in notes of which the sum of $156,000 represented consideration for the loan.

Palpar also acquired as security for payment of the notes by Lincoln the following:

(1) A mortgage duly recorded in favor of Palpar constituting a first lien on the motel and improvements thereon;

(2) A mortgage duly recorded in favor of Palpar constituting a first lien on all chattels owned by Lincoln;

(3) A duly recorded assignment of the lease from Lincoln to Palpar;

(4) A duly recorded assignment from Mike-Pol to Palpar of its rights under the construction contract;

(5) A subordination agreement executed by Mike-Pol in favor of Palpar subordinating all claims of Mike-Pol against Lincoln to the liens of all instruments held by Palpar to the extent of $416,000; and

(6) A duly recorded mortgage executed by the Lincoln stockholders in favor of Palpar constituting a first lien on the certificates representing all the outstanding shares of Lincoln and an assignment from all stockholders, officers, and directors of Lincoln to Palpar of the certificates representing all the outstanding shares of Lincoln, together with the resignations of all officers and directors of Lincoln.

In the event of default by Lincoln, the loan agreement expressly granted Palpar the right to enforce the terms and conditions of the security delivered to Palpar, the collection thereof, the right to foreclose the mortgage on the motel, the mortgage on the chattels, and the right to possession under the lease.

Simultaneously, with the transactions between Lincoln and Palpar on December 3, 1958, Lincoln and Mike-Pol settled and stated their account at $184,000 with respect to work, labor, and material performed and supplied by Mike-Pol after giving effect to the receipt by Mike-Pol of $130,000 in value evidenced by its Palpar stock and 2-

year, 6-percent notes and $130,000 in cash from Lincoln. A portion of the agreed sum of $184,000 related to matters other than the construction of the motel.

Pursuant to plan and simultaneously with the transactions between Lincoln and Palpar on December 3, 1958, Lincoln delivered to Mike-Pol its notes for $184,000. As security for payment of the notes:

(1) Lincoln executed in favor of Mike-Pol a second mortgage duly recorded constituting a lien on the motel subordinate to the lien of Palpar;

(2) Lincoln executed in favor of Mike-Pol a second mortgage duly recorded constituting a lien on the chattels owned by Lincoln subordinate to the lien of Palpar;

(3) Lincoln executed in favor of Mike-Pol an assignment duly recorded of the leasehold subordinate to the lien of Palpar; and

(4) Lincoln's stockholders executed in favor of Mike-Pol a mortgage duly recorded constituting a lien on the certificates representing all the outstanding shares of Lincoln subordinate to the lien of Palpar.

Pursuant to plan and simultaneously with the transactions on December 3, 1958, Mike-Pol executed and delivered to Palpar assignments, duly recorded, of the interests of Mike-Pol in the assignments of the lease to Mike-Pol and in the Lincoln stock originally deposited under the construction contract.

Although not entirely completed, the motel opened for business in January 1959. At that time, Lincoln was unable to obtain any permanent mortgage financing with which to satisfy the $416,000 notes held by Palpar or the $184,000 notes held by Mike-Pol. Lincoln was not, therefore, in a position to meet its obligations under the lease and the notes.

On September 2, 1959, the lessor notified Lincoln of its election to cancel and terminate the lease because Lincoln was in default with respect to payment of taxes. Mike-Pol thereupon paid the rent due and the quarterly installment of real estate taxes. Mike-Pol simultaneously commenced proceedings to foreclose its second mortgage on the chattels and its second mortgage on the Lincoln stock, both of which were subordinated to the rights of Palpar.

On November 12, 1959, Lincoln surrendered possession of the motel to Mike-Pol as mortgagee in possession, its officers and directors submitted their resignations, and its stockholders surrendered the stock of Lincoln to Mike-Pol. Also, on that day Lincoln assigned the lease and executed a release and surrender of all the chattels to Mik-Pol.

On November 17, 1959, John Bertoni, constable, published notices of the public foreclosure sales under the second mortgage on the chattels and under the second mortgage on the stock. On the same day creditors of Lincoln filed an involuntary petition in bankruptcy against

Lincoln in the U.S. District Court, District of New Jersey. On November 18, 1959, the U.S. District Court adjudicated Lincoln bankrupt. The U.S. District Court enjoined the public foreclosure sales that had been scheduled for November 19, 1959, and ordered an investigation to determine the consideration for the second mortgage on the chattels.

On November 30, 1959, the U.S. District Court, pending the outcome of the bankruptcy proceedings, restrained foreclosure of the mortgages held by Mike-Pol.

On December 28, 1959, the trustee in bankruptcy challenged the validity of the second mortgage on the leasehold, the second mortgage on the chattels, the first mortgage on the leasehold, and the first mortgage on the chattels, on the grounds of usury, and questioned the amounts due on account of the notes for $184,000 and on account of the notes for $416,000.

Mike-Pol operated the motel in a fiduciary capacity as mortgagee in possession from November 1959 until April 1960. In April 1960, Mike-Pol, as mortgagee in possession, surrendered possession of the motel to Palpar. Palpar took possession of the motel as mortgagee in possession under the first mortgage on the leasehold and the first mortgage on the chattels. Palpar operated the motel in a fiduciary capacity as mortgagee in possession from April 1960 to February 6, 1961. During 1959 and 1960, Palpar received payments of $41,000 from Lincoln and $41,200 from Mike-Pol and itself, as mortgagees in possession, with respect to the $416,000 notes, reducing the face amount of such notes to $333,800. Palpar treated these receipts on its corporate income tax returns for such years as repayments of principal.

During the period Mike-Pol operated the motel, Pollotta approached Morris in regard to working at the motel. Morris was engaged in the real estate business as a broker and, in that capacity, had become acquainted with Cohn. She had no motel experience at that time and worked for Pollotta at the switchboard and as a desk clerk for only a few months. Subsequently, Morris was approached by Cohn to discuss the possibility of their purchasing the motel and her managing it.

During October 1960, Cohn wrote a series of letters to the New Jersey secretary of state requesting clearance of a name for a corporation which he proposed to organize for the purpose of consummating the purchase of the motel assets from the trustee in bankruptcy. Simultaneously, Cohn made an offer by form letter to each of the Cohn group personally to purchase their respective shares of Palpar stock and Palpar notes at the rate of $7,500 for each 5,000 shares and $5,000 note. The offer was intended to return to each the cash invested in Palpar less the amount they previously had collected. The offer was subject to the condition, *inter alia*, that Cohn or his nominee or assignee acquire

all of the right, title, and interest of the trustee in bankruptcy in the motel assets for the sum of $25,000.

By letter dated November 1, 1960, Cohn or his nominee or assignee also made an offer to purchase for the sum of $97,500 Palpar stock, Palpar notes, and the unpaid balance of the $184,000 notes held by Mike-Pol.

Between February 1, 1961, and April 13, 1961, Cohn personally acquired the Palpar stock and Palpar 2-year, 6-percent notes owned by the investors comprising the Cohn group for the sum of $97,500.

During February 1961, Cohn also acquired from Mike-Pol its Palpar stock, its Palpar notes, and the notes secured by the second mortgage upon payment of the sum of $97,500. The price paid to Mike-Pol for the Palpar stock and Palpar notes, and the $184,000 notes was not separately negotiated. Cohn would not acquire the Palpar stock and Palpar notes without also acquiring the $184,000 notes. At all times material herein, Michael Pollotta and the members of his family who organized Mike-Pol were, and for many years had been, clients of Cohn. The investors comprising the Cohn group who had subscribed to the stock and purchased the notes of Palpar were also clients and/or business associates of Cohn.

On October 25, 1960, Cohn submitted an offer to Sanford Silverman, attorney for the trustee in bankruptcy, to purchase all of the trustee's right, title, and interest in and to the motel assets subject to the liens representing the security for the $416,000 notes and $184,000 notes, for $25,000, subject further to the condition that the trustee terminate the litigation involving such notes. Silverman also represented at least two-thirds of the general creditors of Lincoln.

On December 28, 1960, Silverman filed a petition and order to show cause in the bankruptcy proceeding. On December 29, 1960, the U.S. District Court entered an order to show cause addressed to the creditors of Lincoln returnable on January 19, 1961, why the trustee in bankruptcy should not accept an offer of $25,000 for his interest in all the motel assets of Lincoln and mailed notice thereof to all creditors.

Silverman mailed a copy of the show-cause order to Cohn on December 31, 1960. Cohn, upon receipt of the copy of the order to show cause, telephoned Silverman and advised him that the offer had not been made by Mike-Pol and Palpar. Silverman advised Cohn that to correct the various papers to reflect the identity of the real purchaser would entail filing a new petition and new order to show cause and a new mailing to creditors upon a minimum of 10 days' notice.

On January 19, 1961, the referee in bankruptcy signed an order authorizing the trustee in bankruptcy to accept the offer of $25,000 for the motel assets of Lincoln.

On or about January 23, 1961, Cohn obtained clearance from the secretary for the use of the corporate name "Gateway Motor Courts, Inc." On January 27, 1961, Cohn and Morris, as equal stockholders, organized a corporation named Gateway Motor Inn, Inc.

By letter dated February 2, 1961, Cohn advised Silverman, counsel for the trustee in bankruptcy, that the acceptance of the offer made by Mike-Pol and Palpar to purchase the assets of Lincoln from the trustee in bankruptcy had been assigned to Gateway. Cohn requested Silverman to prepare the bill of sale designating Gateway as the purchaser. In reply, Silverman advised Cohn that he would prepare the bill of sale in the name of Palpar and Mike-Pol in order to be consistent with the order.

On February 6, 1961, Gateway drew a check on its checking account in the amount of $25,000 payable to the order of the trustee in bankruptcy and delivered it to Silverman. Silverman delivered the bill of sale and a release with respect to the trustee's alleged claims. Palpar, as mortgagee in possession, thereupon surrendered possession to Gateway of the motel.

By letter dated February 20, 1961, Cohn forwarded lessor a copy of the recorded assignment of the lease from Mike-Pol to Gateway, together with an agreement executed by Gateway in favor of lessor in which Gateway agreed to comply with the terms of the lease.

For Federal income tax purposes, Gateway computed its initial basis for depreciation of the motel assets acquired from the trustee in bankruptcy as follows:

| | |
|---|---|
| Cash | $25,000.00 |
| Unpaid balance of $416,000 notes | 333,800.00 |
| Unpaid balance of $184,000 notes | 173,962.67 |
| | 532,762.67 |
| Less amount allocated to nondepreciable assets purchased | 32,664.41 |
| Initial basis for depreciation | 500,098.26 |

From December 3, 1958, to February 6, 1961, Palpar received payments in cash on account of the $416,000 notes in the following amounts during the following fiscal years of Palpar:

| Fiscal years | Amounts |
|---|---|
| Nov. 1, 1958, thru Oct. 31, 1959 | $41,000 |
| Nov. 1, 1959, thru Oct. 31, 1960 | 41,200 |
| Nov. 1, 1960, thru May 30, 1961 | 0 |
| Total | 82,200 |

Between November 1, 1958, and October 31, 1960, Palpar paid pro rata to the Cohn group and Mike-Pol a total of $71,398.60.

In May 1961, Palpar adopted a plan of liquidation under section 333 of the Internal Revenue Code of 1954, as amended. Pursuant to such plan, Palpar distributed to Cohn the unpaid balance of the notes amounting to $333,800.

During the taxable years 1961 to 1964 inclusive, the motel consisted of 52 units and a swimming pool. The motel did not have sufficient rooms to acquire a nationally advertised franchise such as a Holiday Inn or Howard Johnson. The motel was situated on a tract of land containing 7.185 acres. The parcel had been leased pursuant to the lease, which provided, among other things, that the lessee could only use the land for the purposes of a motel business (during the first 20 years of the term), that any mortgage of the motel would be subordinate to the lease, and that the lessor could terminate the lease in the event of any attempted taking or other similar action with respect to the premises.

The initial construction cost of the motel, excluding furnishings and land, approximated $305,000, plus extras. Furnishings approximated $80,000.

Shortly after Gateway purchased the motel, approximately $100,000 was expended for repairs and improvements. Subsequently, an additional sum approximating $250,000 was invested in connection with the addition of 36 units.

During the period November 11, 1959, to October 31, 1960, the motel generated gross income of $208,135 and a cash flow of approximately $75,000. For the period February 1, 1961, to January 31, 1962, the motel had gross revenues of $225,847 and a cash flow of $88,039, consisting of $24,047 profit plus $35,487 depreciation plus $28,505 mortgage-interest service.

For the period February 1, 1962, to January 31, 1963, the motel had gross revenues of $266,304 and a cash flow of $85,708, consisting of $11,704 profit plus $45,499 depreciation plus $28,505 mortgage-interest service.

For the period February 1, 1963, to January 31, 1964, the motel had gross revenues of $297,116 and a cash flow of $83,086, consisting of $4,539 profit plus $50,042 depreciation plus $28,505 mortgage-interest service.

As of February 1961, the fair market value of the $333,800 of notes of Lincoln held by Palpar and secured by a first lien on the leasehold did not exceed the sum of $195,000. The $173,962 of notes of Lincoln secured by a subordinated mortgage on the leasehold were worthless. The fair market value of the leasehold, including both the motel and its furnishings, acquired by Gateway was $333,800.

## Docket No. 6480-67

In docket No. 6480-67, the Court is called upon to determine the basis for depreciation of the motel in the hands of Gateway. Section 167(g) provides that the basis for depreciation shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or disposition of the property. Insofar as material herein, section 1011 provides that the basis for determining gain shall be determined under section 1012. As determined under section 1012, the basis of Gateway for purposes of depreciation of the motel is prescribed as the cost of such property.

Gateway claims to have acquired the motel from the trustees in bankruptcy for the payment of $25,000 in cash, subject to non-interest-bearing notes in the principal amount of $333,800 secured by a first lien on the motel, and to non-interest-bearing notes in the principal amount of $173,962 secured by a second lien on the motel. Gateway claims that its "cost" in the acquisition of the motel thus consisted of the sum of $25,000 plus the unpaid balance of both series of notes, relying on *Crane* v. *Commissioner*, 331 U.S. 1 (1947), and *Manuel D. Mayerson*, 47 T.C. 340 (1966).

The respondent argues, *inter alia*, that the motel was acquired in the first instance by the holder of the secured notes in what was tantamount to a voluntary foreclosure. On that assumption, respondent contends that basis for the property is fair market value. When Gateway subsequently acquired the motel, it took over that basis. In support of this position, respondent relies on I.T. 3548, 1942-1 C.B. 74, and sec. 1.166-6, Income Tax Regs. In addition, the respondent contends that the notes were, in part, worthless and that even under the *Crane* rule there should be excluded any liabilities which exceeded the value of the property.

In considering this issue, we need only look to the situation that prevailed at the time that Gateway acquired the motel. Lincoln held the leasehold. The motel had been substantially completed. Lincoln was hopelessly insolvent. Its obligations included the sum of $333,800 secured by a first lien on the motel, the sum of $173,962 secured by a second lien on the motel, and the sum of $78,980.49 in unsecured claims. In a forced sale, it was doubtful whether the motel could be sold for as much as $250,000.

It is clear from the record that assuming the validity of the notes secured by a first lien on the motel—and the parties do not question their validity—neither Mike-Pol as the holder of the subordinated notes nor the unsecured creditors stood to recover anything in the event of a foreclosure sale. For all practical purposes, the subordinated

series of notes and the unsecured claims had become worthless. On the other hand, without a formal foreclosure, the holder of the notes secured by a first lien on the motel could not take over the motel free and clear of other claims. In the final analysis, therefore, the only value which might be attributable to those claims was a "nuisance value."

At this point, Cohn evolved a plan to take over and operate the motel. He purchased the stock and notes of Palpar held by a group of his clients and associates at a price which would make them "whole." At the same time, he purchased the stock and notes of Palpar held by Mike-Pol, the corporation organized to construct the motel, together with the subordinated notes of Lincoln held by Mike-Pol, at the same price. Cohn then submitted an offer to the trustee in bankruptcy to purchase the motel subject to the secured obligations for the sum of $25,000. Upon the acceptance of that offer, Cohn or Gateway, as his nominee, became the owner of the motel free and clear of all obligations except those held by Cohn.

The offer to purchase the motel subject to the secured obligations was treated by the trustee in bankruptcy as having been made on behalf of Palpar and Mike-Pol, the holders of record of those obligations. The notices were sent out, and the sale was approved in that form. Petitioners contend, however, that this was in error. Petitioners argue that the transaction was a purchase of the motel by Gateway subject to the secured obligations for the sum of $25,000. The difficulty with petitioners' characterization of the transaction is that without the cooperation and consent of the holders of the secured obligations—and specifically of Cohn himself—the transaction could not have been consummated. If we are to look to the substance of the transaction, therefore, the holder of the secured debt must be regarded as having caused the property to be transferred to Gateway subject to such debt.

While the Court must, as a matter of record, regard the proposal as having been made on behalf of Palpar and Mike-Pol, respondent's reliance on that is misplaced. The conclusion is inescapable that it was never intended for either Palpar or Mike-Pol to acquire the motel. What we have is a situation in which a secured creditor arranges for a purchase by a third party of the property securing his debt from the bankrupt's estate. Cf. *Parker* v. *Delaney*, 186 F. 2d 455 (C.A. 1, 1950). Where a corporate purchaser takes property subject to a debt, the fact that the same individual or individuals own the stock of both the debtor and the creditor is not sufficient reason to disregard the debt. *Imperial Car Distributors, Inc.* v. *Commissioner*, 427 F. 2d 1334 (C.A. 3, 1970). To the extent that the motel was burdened with secured debt not in

excess of the fair market value of the property, the basis in the hands of Gateway would under the *Crane* case include the amount of such debt as a part of its cost. When Gateway acquired the motel subject to the indebtedness owing to Palpar and constituting a first lien against such property, the amount of such indebtedness became a part of the basis of Gateway for purposes of computing depreciation.

It does not follow that the same rule would apply in the case of the indebtedness due to Mike-Pol which was secured by a subordinated lien on the property. In the event of a forced sale, the motel would not bring a sufficient amount to pay the indebtedness secured by the first lien. Unsuccessful efforts had been made to find a buyer for or to refinance the property in order to preserve both the indebtedness due to Palpar and the indebtedness due to Mike-Pol. Cohn had represented the stockholders of Mike-Pol for many years. He paid nothing additional for the notes held by Mike-Pol. Unless those notes were considered by the parties as worthless, Cohn would be in a position favoring one group of his clients over the other. We must assume that no consideration was attributed to the notes held by Mike-Pol because the notes were worthless.

Where worthless debt is acquired without consideration, as a part of an overall plan to transfer the property to a corporation to be owned and controlled by the holder of the debt, such debt becomes solely a device to inflate the true cost of the property for tax purposes. Neither the *Crane* case, nor any decision which followed, warrants the inclusion of such worthless paper as a part of the taxpayers' cost or basis for depreciation. See *Burr Oaks Corporation* v. *Commissioner*, 365 F. 2d 24 (C.A. 7, 1966).

Regardless, however, whether we treat the transaction whereby Gateway acquired the property as contended for by petitioners, or whether it is considered as being tantamount to a voluntary foreclosure on the part of the holder of the secured obligations as contended for by respondent, the result would be the same.

The cost of construction of the motel exceeded the sum of $305,000. An additional $80,000 had been spent for furnishings. The financial difficulties resulted not from the motel itself, but from the lack of financial resources on the part of its original owner. Expert witnesses placed a sales value on the motel ranging from $250,000 to $400,000 with a substantial initial investment.

After considering all of the evidence with respect to value, it is our opinion that the fair market value of the motel as of the date of its acquisition by Gateway was $333,800. Under either view of the transaction, therefore, an amount equivalent to the notes secured by a first lien on the property would properly be includable in the basis of Gateway.

*Docket Nos. 2752–66 and 6497–67*

These proceedings involve or relate to the tax liability of Palpar on account of payments received prior to its liquidation on the notes of Lincoln secured by a first mortgage on the leasehold. In the notices of deficiencies, the respondent determined that Palpar received interest on account of such notes as follows:

| | |
|---|---|
| Fiscal year ended Oct. 31, 1959 | $15,375.00 |
| Fiscal year ended Oct. 31, 1960 | 15,047.10 |
| Taxable period ended May 31, 1961 | 125,175.00 |

The petitioners, Edna Morris and Sidney Cohn, do not contest their liability as transferees for such taxes as may be owing from Palpar. However, the petitioners contend that there are no taxes due.

Palpar was organized on November 19, 1958, with a purpose of refinancing costs incurred in the construction of the motel. On December 3, 1958, Palpar advanced to Lincoln a total of $260,000, in cash or its equivalent, on account of which Palpar received non-interest-bearing notes of Lincoln in the amount of $416,000. These notes were repayable over 100 consecutive weeks at the rate of $1,000 per week for 99 weeks and $317,000 at maturity. The notes constituted a first lien on the lease, improvements, chattels, and stock of Lincoln.

During the taxable year ended October 31, 1959, Palpar received a total of $41,000 in payment of the notes. In its Federal income tax return for such year, Palpar treated such payments as a return of capital and paid no tax thereon.

During the taxable year ended October 31, 1960, Palpar received a total of $41,200 in payment of the notes. In its Federal income tax return for such year, Palpar treated such payments as a return of capital and paid no tax thereon.

In his determination of deficiency for those years, respondent takes the position that such payments represented in part the repayment of principal and in part the payment of interest. By allocating the respective amounts to principal and interest on the basis of the premium of $156,000 received by Palpar as a result of its loan of $260,000 to Lincoln, respondent determined that the amounts of $15,375 and $15,047.10, respectively, constituted interest received during the years in question.

In addition, for the taxable period ended May 30, 1961, the respondent determined that Palpar received the balance of the premium amounting to $125,175 as a result of acquiring the motel from the trustee in bankruptcy in a voluntary foreclosure.

Petitioners contend that the payment of the notes was "speculative"

and that no income could be realized as a result thereof until Palpar recovered the principal amount which it had loaned to Lincoln citing *Wingate E. Underhill*, 45 T.C. 489 (1966). In reply, respondent cites *Morton Liftin*, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963), as supporting the basis for his determination.

The respondent seeks to invoke the rule that where the value of the security exceeds the amount of the obligation, so that there is a reasonable expectation that the full amount might be recovered either through payment or foreclosure, the taxpayer must treat a portion of each payment as interest received. As respondent points out in his brief, it is manifestly inconsistent for petitioners to argue on the one hand that the fair market value of the property exceeded the face amount of both the first lien and the second lien notes, while at the same time contending that payment of the preferred obligations was "speculative."

With respect to the payments actually received by Palpar, we find no justification for excluding from income so much of the amount actually paid which is allocable to premium or interest. In fact, for the fiscal year ending October 31, 1959, $41,000 of the notes were paid prior to any default on the part of Lincoln. Subsequent to Lincoln's default, while it might have been anticipated that there would be some delay in the payment of the notes, Palpar actually collected an additional $41,200 on account of such notes. Based upon the testimony of expert witnesses, the Court has found that the fair market value of the security equaled the remaining amount due, which included both principal and interest or premium. It necessarily follows that the security for the repayment of "cost" was at all times more than adequate.

As distinguished from the obligations in the *Underhill* and *Liftin* cases, the notes held by Palpar constituted a first lien on the motel and its furnishings. Since the Court has found that the fair market value of the motel equaled the unpaid balance of the notes when distributed by Palpar in liquidation, there was ample security for the recovery of "cost." Therefore, we do not regard the circumstances in this case as affording sufficient basis for the application of the exception to the normal reporting of income.

With respect to the remainder of the premium amounting to some $125,175, admittedly Palpar received nothing during the period ended May 31, 1961. Rather, respondent would treat the transaction as if Palpar had bid in the property for the full amount of its notes at foreclosure. To adopt the respondent's theory would be incompatible with the facts. Accordingly, we find no basis for treating the premium of $125,175 as having been received by Palpar.

*Docket Nos. 6478–67 and 6479–67*

In docket Nos. 6478–67 and 6479–67 there remains for determination the amount, if any, taxable as a dividend upon the liquidation of Palpar. The petitioners, as stockholders of Palpar, received all of its assets upon such liquidation on May 31, 1961. The sole question for decision is whether there were earnings and profits of Palpar taxable to petitioners as a dividend pursuant to section 333(e). This depends, in turn, upon whether Palpar realized any income on account of the payments of $41,000 during the taxable year ended October 31, 1959, and $41,200 during the taxable year ended October 31, 1960, on account of the notes of Lincoln, and whether Palpar realized income in the form of interest or premium in the purchase of the motel by Gateway. Our decision in docket Nos. 2752–66 and 6497–67 are determinative of these questions. In light of that decision, the parties will be afforded an opportunity to recompute the earnings and profits of Palpar under Rule 50.

In order to reflect the opinions herein,

> *Decisions in all dockets consolidated for the purpose of this proceeding will be entered under Rule 50.*