HARRIET M. BRYANT TRUST, DR. CARL BRYANT SCHUTZ, ET AL., TRUSTEES, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14508.   Promulgated September 27, 1948.

---

*Roy C. Hormberg, Esq.*, and *E. R. Morrison, Esq.*, for the petitioner.
*George E. Gibson, Esq.*, for the respondent.

OPINION.

JOHNSON, *Judge*: The petitioner trust assails the Commissioner's determination of gain on its sale of the Security Building property in 1941, charging error (1) in the use of $162,531.89 as basis; (2) in ascribing to the building a 40-year life for computing the depreciation adjustment to basis, and (3) in the allocation of sale proceeds between land and building.

(1) As the trust acquired the property by devise, its basis is, under section 113 (a) (5), Internal Revenue Code, "the fair market value of such property at the time of such acquisition," which time was April 8, 1920, the date of Harriet M. Bryant's death. Regulations 103, sec. 19.113 (b) (1). On the estate tax return the property was reported by the executors at the figure which the Commissioner has adopted as basis, and, since under sec. 19.113 (c) fair market value for basis purposes shall be deemed the value at date of death "as appraised for the purpose of the Federal Estate Tax," respondent argues that such appraisal figure is *prima facie* evidence, *Elizabeth J. Bray*, 4 B. T. A. 42, entitled to great weight, and contends that it is independently supported by the terms of the lease contract which permitted the lessee's retention of rentals until at least 1938 for application to the building's cost.

While normally true that the accepted valuation of property on an estate tax return is to be taken as its basis to the devisee, the devisee is not estopped to claim a different value. *May Rogers*, 31 B. T. A. 994; affd. (C. C. A., 2d Cir.), 107 Fed. (2d) 394; cf. *United States* v. *Dickinson* (C. C. A., 1st Cir.), 95 Fed. (2d) 65. And that right is here *a fortiori* available to petitioner because the property was erroneously included in the value of gross estate under the holding in *Crooks* v. *Harrelson*, 282 U. S. 55, and further because the details of computation, given on the return, affirmatively indicate that the subject of valuation was not the property itself, but the decedent's rights in it as modified by a contract requiring the use of income from it for the payment of an obligation. The figure of $162,531.89 used on the return was reached "after carving out a particular estate of 17 years." This "particular estate" was the lessee's right to retain rentals for application to cost of the building which the lessors had agreed to pay in this way.

The "property" which decedent devised was not, as respondent puts it, "a bundle of rights," but leased real estate improved with an eight-story building. By contract decedent was bound to reimburse the lessee for the cost of the building and to pay interest on the unreimbursed part of such cost by permitting him to retain and apply to cost and interest the monthly installments of rentals, as they came due. At her option she could also make reimbursement in cash, but in fact never elected to do so. Having no direct personal liability to reimburse,

decedent was in a position analogous to that of a purchaser of mortgaged property who assumes no personal liability for the mortgage note, and petitioner is in the position of a devisee of property so encumbered. The value of an owner's interest in such property is commonly thought of as the difference between the fair market value of the property unencumbered and the amount of the debt or obligation which it secures, and in commercial parlance this interest is termed an "equity."

But such an expression of convenience does not modify the concept of "property" as used in the revenue acts, and the "equity" of a decedent owner in real estate is not the "property" which should be valued for inclusion in gross estate or for basis in the computation of a gain or loss on a subsequent disposition. It is now settled by *Crane* v. *Commissioner*, 331 U. S. 1, that the revenue acts preclude:

* * * an equity basis, and the use of it is contrary to certain implicit principles of income tax depreciation, and entails very great administrative difficulties. * * *

* * * the proper basis under § 113 (a) (5) is the value of the property, undiminished by mortgages thereon * * *.

We are of opinion that the cited decision is here controlling. Respondent argues earnestly that the differences between a mortgage and a lease are so fundamental as to deprive the decision of bearing on the issue here. He stresses that "there was no debt which the lessee could have enforced at law against the lessors. His rights were merely those of a lessee—not those of a creditor or mortgagee." If the contract contained only lease provisions, this argument would be sound. But it contains more. It provides not only for the payment of $461,704.70 with interest to the lessee, but secures that payment by allowing him to retain the rentals. Oppenstein was a creditor as well as a lessee, and, while the debt was not collectible except in the manner specified, that manner effectively secured payment. Significantly, the Supreme Court in the *Crane* opinion deemed it immaterial whether or not:

* * * the mortgagor is, strictly speaking, a debtor on the mortgage * * *. We are rather concerned with the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations. If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another.

So here, discharge of the reimbursement obligation conferred upon decedent and thereafter upon petitioner benefits in the form of a releasing of prospective rents as real and as substantial as the discharge of a personal debt.

The "property" subject to valuation on April 8, 1920, is not, therefore, an "equity" or difference between the value of the fee and the obligation secured by rentals; it is the land and building. To establish the value of this property petitioner introduced Byron F. Shutz and Willard Rush, two real estate dealers of many years experience in Kansas City, both of whom were familiar with the Security Building and the terms of the lease contract. They agreed that, on the basis of sales and leases of similar property, on April 8, 1920, the Security Building property had a value of about a million dollars. But, because the 50-year lease at a stipulated rental fixed the possible income from the property at $26,602 (an average of the graduated rentals), they considered that a willing buyer would adjust his bid by reference to the income factor, and as 5 per cent was then the market return on the highest grade of real estate (and this property was of the highest grade), prospective income was capitalized at 5 per cent and a fair market value of $532,040 was reached by both.

Respondent attacks the witnesses' estimate, contending that they incorrectly assumed immediate production of rentals, whereas in fact a buyer would receive nothing under the lease contract for at least 18 years, or, under the lessee's construction of the terms, for more than 18 years. He admits that application of rentals to discharge of the lessors' reimbursement obligation was receipt "in a highly conceptualistic sense," but argues that in practical effect the building was "rent free" during the reimbursement period, and that this rent-free period was properly "carved out" of the property as valued on the estate tax return and the deficiency determination here in controversy.

We do not deem the rentals applied to reimbursement mere conceptualistic receipts. The Circuit Court of Jackson County, Missouri, held them to be income sufficiently real to require distributions among the income beneficiaries of the trust to the extent that they were applied to cost reimbursement, and in *Moulton Green, Trustee*, 24 B. T. A. 1121, the Board of Tax Appeals was of the same opinion. In holding taxable as capital gain the profit from sale of another building which petitioner's trustees had sold to pay the amount awarded the income beneficiaries, it said:

From and after the death of Harriet M. Bryant the rentals due under the Oppenstein lease were income to the estate, even though not received in cash, and the District Court of Jackson County found that under the terms of the trust instrument such income was distributable to the beneficiaries.

It is not true, moreover, that a buyer of the Security Building could not have immediately received the rents in cash, for by paying off the remaining cost reimbursement he could have freed the rentals from any lien. Such payment by him would have been merely a part of cost in the same manner as the discharge of a mortgage. In 1932 the trustees made such a payment.

Respondent objects in the alternative that petitioner's witnesses used too low a capitalization percentage, pointing out that a 6 per cent return was assumed in the computation on the estate tax return. Both witnesses justified the low percentage on the ground that the property was real estate of the highest grade, which insured the safety of the income, and we are the more convinced of this safety because of the appraisal of the premises, if unleased, at about a million dollars. Witness Rush stressed that there was a rise in prices from 1916 to 1918, and the cost of the building was much more than anticipated with the result that, contrary to expectations, the monthly rental was exceeded by the amounts retainable for reimbursement and interest and the 20-year period, adequate to return cost at 5 per cent annually, would not suffice for full reimbursement with interest. The lessee contended that the monthly deficits should be carried forward and paid in subsequent years; the lessors argued that the obligation was satisfied by rental applications over the 20-year period specified. This controversy, however, related to interest; the monthly rental was always ample to cover one-twelfth of 5 per cent of cost, and in 1932 cost was reimbursed in full.

We accept the witnesses' appraisals, and find that on April 8, 1920, the Security Building property had a fair market value of $532,040, as petitioner contends. While the appraisal rests primarily on an income formula, other factors normally considered in valuation indicate a much larger figure. These other factors hence fully support the appraisal *pro tanto*, but their effect is partially offset by the long term lease which limited possible income for about 48 years from decedent's death and would obviously have an adverse effect on value. As said by the Supreme Court in *Cleveland, Cincinnati, Chicago & St. Louis Railway Co.* v. *Backus*, 154 U. S. 439:

* * * the value of property results from the use to which it is put and varies with the profitableness of that use; present and prospective, actual and anticipated. * * * The amount and profitable character of such use determines the value, and if property is taxed at its actual cash value it is taxed upon something which is created by the uses to which it is put.

The treatment of this value, undiminished by the reimbursements due, as petitioner's basis, is not only in accordance with the holding of *Crane* v. *Commissioner, supra,* wherein the devised property was sold subject to the mortgage obligation existing at its acquisition, but is mandatory, because the reimbursements of $422,105.60 remaining due at petitioner's acquisition were actually paid off by petitioner. In his computation of basis the Commissioner recognizes as an addition to cost an allocated part of the $150,000 settlement payment of 1932, but he does not so recognize the rentals previously applied to reim-

bursement. We hold that both were paid in partial discharge of the property's cost to decedent; that petitioner's basis is $532,040; and that any adjustments in a gain or loss computation which the contract's reimbursement obligation might have made necessary on subsequent disposition was canceled, and eliminated by the satisfaction of that obligation at par.

(2) In computing gain, the Commissioner allocated one-half of the determined basis to the building and reduced that half by $63,777.92 representing depreciation from April 8, 1920, to December 31, 1940, calculated on an estimated useful life of 40 years. Petitioner agrees that one-half of the basis should be allocated to the building, and, as no issue is raised as to this, we shall so assume. Petitioner contends, however, that depreciation should be calculated at 2 per cent on an estimated useful life of 50 years. The witnesses' testimony supports this view in a very categorical manner, but without any description of the building's construction or the material used. The 50-year term of the lease and the subsequent 15-year extension, however, are very persuasive that a useful life substantially in excess of 40 years was expected. We find, therefore, that depreciation should be computed at the rate of 2 per cent per annum.

(3) On the 1941 return petitioner computed a long term capital loss of $91,788.04 on sale of the property, treating the whole as a capital asset. In determining a gain from the sale, the Commissioner made separate computations as to land and building because by section 117 (a) (1), Internal Revenue Code, "property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in Section 23 (1)," is not a capital asset and profit from its disposition is not taxable as a capital gain, but as ordinary income to its full extent. Profit from sale of the land, on the contrary, is a capital gain, and, as petitioner's land had been held over 6 months, only 50 per cent of such gain is subject to tax. In making the separate computations, the Commissioner allocated $197,587.21 of the selling price of $411,750 to the land and $214,162.79 to the building. This allocation was made on the basis of local real estate assessments.

Petitioner contends that 40 per cent of the selling price should be attributed to the building and 60 per cent to the land. The witnesses expressed this opinion, stressing that in 1941 the building had sustained substantial depreciation. While the testimony is rather meager, the reasoning is persuasive, for in 1941 the building had been standing 23 years, and it is not reasonable to believe that steady depreciation would fail to shift to the land a larger portion of the whole property's value. We accept petitioner's allocation and so find.

*Decision will be entered under Rule 50.*