**FORT HAMILTON MANOR, INC.,**
Petitioner-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**DAYTON DEVELOPMENT FORT HAMILTON CORP., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

Nos. 260, 261, Dockets 34484, 34485.

United States Court of Appeals,
Second Circuit.

Argued Jan. 28, 1971.

Decided July 1, 1971.

Stuart E. Seigel, Washington, D. C. (Cohen & Uretz, Norman L. Schwartz, Washington, D. C., of counsel), for petitioners-appellants.

John A. Townsend, Attorney, Tax Div., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Dept. of Justice, Meyer, Rothwacks and Grant W. Wiprud, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before WATERMAN, MOORE and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Petitioners Fort Hamilton Manor, Inc. (Fort Hamilton) and Dayton Development Fort Hamilton Corp. (Dayton Development) appeal from judgments of the Tax Court wherein it was adjudged that there were deficiencies in income taxes due from Fort Hamilton for the fiscal years ending May 31, 1961 and May 31, 1962 of $362,379 and $12,705, respectively and from Dayton Development for the fiscal year ending November 30, 1961 of $159,047.

Fort Hamilton and Dayton Development were organized under the New York Stock Corporation Law on April 21, 1950 and October 21, 1949, respectively, for the purpose of constructing and operating rental housing projects.[1]

---

1. The Stock Corporation Law was repealed by L.1966, c. 664 § 16, effective September 1, 1967. Its subject matter is now treated in the Business Corporation Law.

They pursued this purpose by leasing in 1950 from the United States a tract of land on which they constructed residential units to be rented to personnel of the armed services (sometimes referred to as Wherry Housing). Four brothers, the Zukermans, each owned a 25% stock interest in the corporations.

In 1957 petitioners were advised by the Army that it desired to acquire the Wherry Housing projects, a desire which the Government accomplished by a Declaration of Taking filed in the United States District Court for the Eastern District of New York on December 15, 1960. The efforts of petitioners subsequent to the 1957 notice of prospective condemnation to acquire replacement property for the reinvestment of the proceeds received upon condemnation so as to qualify for nonrecognition under Section 1033 of the Internal Revenue Code of 1954 and whether those efforts were successful are the subject matter of this appeal.

The facts in large part have been stipulated and are not seriously in issue. It is the consequences of these facts and the proper interpretation to be given to § 1033 that form the real issues.

Petitioners contend that they made timely purchases of replacement property within the time period specified by § 1033(a) (3) (B) and, hence, did not have to report a gain in their income tax returns.[2] This contention, in turn, is based upon the assumption that the use of the cash proceeds from the condemnation, which were paid in January and February 1961, to make advances on contracts for the acquisition of replacement properties (the contracts were executed on March 15, 1961 and provided for petitioners' purchase of replacement properties) satisfied the requirements of § 1033 despite the fact that the properties were not conveyed by deed to petitioners until October 11, 1963. March 15, 1961 was well within the allowable time; October 11, 1963 was beyond even the extended period.

The Commissioner argues that nonrecognition under § 1033(a) (3) (A) is available only when a taxpayer "purchases other property" within "one year after the close of the first taxable year in which any part of the gain upon the conversion is realized" (subject to extension by the Secretary (B) (ii)). The expiration dates were respectively May 31,

---

2. Section 1033 (I.R.C. of 1954) as it was at the time relevant to this case provided that:

"(a) General Rule.—If property (as a result of its * * * condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

* * * * *

"(3) Conversion into money where disposition occurred after 1950—into money * * *, and the disposition * * * occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

"(A) Nonrecognition of gain—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, *purchases* other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer, the gain shall be recognized only to the extent that the amount realized upon such conversion

* * * exceeds the cost of such other property or stock. * * *

"(B) Period within which property must be *replaced*—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

"(i) one year [two years for dispositions made after December 30, 1969] after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

"(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe." (Emphasis added.)

1963 (Fort Hamilton by extension) and November 30, 1962 (Dayton Development).

Petitioners' principal argument is based upon the premise that a review of the history of § 1033 prior to the insertion of the words "purchases other property" in the 1951 amendment, enables the conclusion to be reached that acquisition of the replacement property within a prescribed period was not required —hence, as here applied, the "purchase" was effected by the contracts of March 15, 1961 within the period and that acquisition by deed was permissible beyond the period.

The Tax Court recognized that "it was the intention of the petitioners to replace the condemned Wherry properties with portions of the Seaside Rockaway project" but concluded that petitioners did not purchase the properties until October 11, 1963, the date on which the properties were conveyed by deed to them. The Court traced the steps taken by petitioners in their endeavor to achieve their purpose.

To replace their Wherry Housing, petitioners successfully negotiated with the City of New York (the City) for the right to construct a housing project in the Rockaway section of Queens County. To qualify for certain property tax benefits under the Redevelopment Companies Law (McKinney's Unconsolidated Laws, Chap. 2, secs. 3401–3426),[3] the owner had to be a "redevelopment company". Dayton Seaside Corporation (Seaside) was organized by the Zukermans on March 5, 1959 to construct six buildings.[4] On October 8, 1959 Seaside agreed with the City to construct low or middle income housing thereon. The land was conveyed to Seaside by the City on November 2, 1959. On March 15, 1961, Seaside agreed to sell to each petitioner a building to be constructed, the agreements reciting the condemnation and petitioners' desire to reinvest the proceeds therefrom. To satisfy Federal Housing Administration requirements, a separate redevelopment company Dayton Seaside No. 2 (Seaside No. 2) also owned by the Zukermans was organized and by deed dated April 23, 1962 land was conveyed by Seaside to it. Construction of the two buildings (by Seaside and Seaside No. 2) started in April 1962.

The buildings were completed, certificates of occupancy were issued on October 11, 1963 and on that date Seaside and Seaside No. 2 conveyed the land and buildings by separate deeds to Fort Hamilton and Dayton Development, respectively.

The tax consequences were as follows:

*Fort Hamilton*

| | |
|---|---:|
| Realized from condemnation | $4,598,500 |
| Adjusted basis of property | 3,148,986 |
| Gain | $1,449,514 |

*Dayton Development*

| | |
|---|---:|
| Realized from condemnation | $1,587,018 |
| Adjusted basis of property | 950,831 |
| Gain | $ 636,187 |

These gains were not included in gross income because of petitioners' election to treat the gains as involuntary conversions under § 1033. The Commissioner's disallowance of petitioners' nonrecognition position resulted in the assessment of the deficiencies here in issue.

Petitioners' intentions to use the condemnation proceeds for replacement property are clear. They advanced moneys on account of a prospective purchase and obtained firm contracts to purchase. To this the Commissioner and the Tax Court say, in effect: A good start but an agreement to purchase is not a pur-

---

3. Subsequent to the year involved, this law was consolidated and now appears in New York Private Housing Finance Law, §§ 101–125 (McKinney's Consol.Laws, c. 44B 1962).

4. A second corporation was organized and contracted with the City to build additional buildings but is not involved in these proceedings.

chase. The actual purchase is effected only when title to the property passes— in this case by the October 11, 1963 deeds. By way of rejoinder petitioners reply that the 1951 tax law amendment must be presumed to be burdened with all the provisions and interpretations of the antecedent statutes dealing with involuntary conversion benefits and that, therefore, the new word "purchases" should not be construed as requiring acquisition of ownership within the specified period.

References to other statutes of former years are scarcely helpful today in deciding whether a purchase connotes the obtaining of title to the property purchased. Since 1921 it has undoubtedly been the intention of Congress to give taxpayers in the position of petitioners here some relief from the immediate imposition of a tax in the event of an involuntary conversion. The 1921 law [5] allowed the deduction from income of any gain provided the taxpayer invested "forthwith" his conversion proceeds in similar property. 1924 brought a change from "deduction" to "nonrecognition." The "forthwith" requirement remained. This provision was perpetuated in the various Revenue Acts between 1924 and 1951.[6] Based upon this situation, petitioners claim that prior to 1951 the law required the *expenditure* of the proceeds "forthwith" but placed no limiting date for the *acquisition* and that this interpretation should be carried over into the 1951 statute. Specifically, petitioners say: "We contend that a purchase within the meaning of the statute can precede the acquisition of ownership of replacement property" (Pet.Br. p. 22). Presumably petitioners would equate "purchase" with a contract to purchase. Petitioners' finely-spun arguments based upon the use elsewhere of the word "acquired," their belief that the 1951 amendment was directed only

to elimination of the tracing requirement and the use of the proceeds to pay off indebtedness on the converted property, and the statute of limitations do not dissuade us from believing that Congress used the word "purchases" in its commonly accepted meaning. Congress desired to confer on taxpayers the privilege of deferring their taxable gains, providing the proceeds were transferred into similar property within a specified time. In short, the ownership which the taxpayer had in the converted property was to be replaced by ownership in a similar property. The identity was to be preserved. When one purchases property, he becomes the owner. By what better way could Congress assure itself that the previous status of property ownership would be maintained? The taxpayer was given a year to make up his mind as to whether he chose to acquire similar property but once his decision was reached he had to purchase it to obtain the tax benefits. To hold that the word "purchases" should be construed as meaning the expenditure of the proceeds upon a contract to purchase at some future time would be an unwarranted distortion.

It is unnecessary to accept or reject petitioners' assumption that prior to the 1951 amendment the statute did not require the acquisition of ownership within a prescribed period. The decisions cited deal with specific fact situations not controlling here. The recent case of Dettmers v. Commissioner of Internal Revenue, 430 F.2d 1019 (6th Cir. 1970), aff'g Johnston v. Commissioner, 51 T.C. 290 (1969) construed "purchases" as used in § 1033(a)(3) as meaning "no less than acquisition of ownership." The facts there were rather analogous to those presented here. The taxpayer deposited a partial down payment under an escrow agreement for the purchase of

---

5. Section 214(a)(12) (Revenue Act of 1921).

6. Section 203(b)(5) (Revenue Act of 1924); Section 112 (Internal Revenue Code of 1939).

replacement property within the permitted period. However, title did not pass to the taxpayer until after the statutory time had passed. Petitioners suggest that we should not follow *Dettmers*. The question of following does not arise. *Dettmers'* construction of the statute coincides with ours.[7] To petitioners' question "whether sufficient events occurred to constitute a 'purchase,'" a negative answer must be given.

The decision of the Tax Court is affirmed.

7. Dettmers v. Commissioner of Internal Revenue, 430 F.2d at 1022 (6th Cir. 1970):

"A provision giving taxpayers an opportunity to avoid taxation on the gain realized upon the involuntary conversion of property was first enacted in 1921. Section 214(a)(12) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, allowed as a deduction from net income the amount received by reason of the involuntary conversion of property if the proceeds of such conversion were '[expended] in the acquisition of other property' of a similar character. In the Revenue Act of 1924 the relief was changed from that of a deduction from net income to the nonrecognition of gain realized on the conversion. The requirement remained, however, that the proceeds be 'expended in the acquisition of other property' of a similar character. Revenue Act of 1924 § 203(b)(5), ch. 234, 43 Stat. 253.

"The provision for nonrecognition of gain realized on the involuntary conversion of property if the proceeds were 'expended in the acquisition of other property' remained unchanged then until 1950. Section 112(f) of the Internal Revenue Code of 1939 was then amended to eliminate the requirement (imposed by the regulations promulgated pursuant to that section [Treas.Reg. 103, § 19.112(f)-1 (1939)]) that the proceeds from the property involuntarily converted be directly traceable to the replacement property. In the amended code section (§ 112(f) (3), applicable only to conversions occurring after December 31, 1950), Congress used for the first time language which was carried over to § 1033(a)(3), by providing for nonrecognition of the gain

if the taxpayer timely 'purchases * * * [replacement] property.'

"The legislative history of the amendment clearly shows that its purpose was to correct two problems then existing with respect to the application of § 112 (f), both of which were caused by the tracing of proceeds requirement, and that it was not intended to change the substantive nature of the relief afforded under the statute. Under the tracing requirement, a taxpayer who acquired replacement property before receiving the proceeds from the involuntary conversion was required to recognize any gain realized on the conversion because the proceeds could not be directly traced to the replacement property. Similarly, a taxpayer who used the proceeds of the involuntary conversion to pay off any indebtedness on the property was required to recognize the gain to the extent it was applied to the indebtedness on the property converted rather than to the acquisition of the replacement property.

"That Congress was concerned with the elimination of these problems rather than the change in the substantive relief is apparent from the language of the legislative report:

"'The enactment of the bill will not only provide appropriate relief for taxpayers who promptly *acquire* replacement property *before receipt* of the proceeds from the converted property, but will also facilitate acquisition of the land needed in connection with defense projects.' Senate Report No. 1052 82d Cong. 1st Sess. (2 U.S.C.Cong. & Adm. News (1951), p. 2598.) (Emphasis supplied.)"