DAVID F. BOLGER AND BARBARA A. BOLGER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5033–68, 5755–68.    Filed March 8, 1973.

*C. J. Queenan, Jr.*, *D. L. Ketter*, *Alan H. Finegold*, and *Allan McClain*, for the petitioners.

*John J. O'Toole*, for the respondent.

---

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' income tax:

| Year | Deficiency |
|------|-----------|
| 1963 | $13,153.44 |
| 1964 | 22,596.75 |
| 1965 | 30,512.00 |
| 1966 | 90,186.00 |

Certain concessions having been made, the only issue remaining for our consideration is whether petitioners are entitled to deductions for depreciation on account of certain real and personal property under the circumstances set forth herein. A decision with respect to this issue governs the allowability of rental and interest expenses and the investment credits claimed by petitioners.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

David F. Bolger (hereinafter referred to as the petitioner) and Barbara A. Bolger are husband and wife whose legal residence was Ridgewood, N.J., at the time the petitions herein were filed. Joint returns for the years in question were filed with the district director of internal revenue for the Manhattan District, New York. Petitioner Barbara A. Bolger is a party herein solely because she filed joint returns with her husband for the years in question.

During the years in question, petitioner was actively engaged in real estate investment and finance. As a result of his experience, he became familiar with the intricacies of various real estate transactions, one form of which is the subject herein.

Petitioner's modus operandi was generally the same for all 10 transactions challenged by respondent. Typically, petitioner would form a financing corporation with an initial capitalization of $1,000. The shareholders consisted of those individuals who would ultimately receive title to the property, as explained *infra.*

Petitioner would then arrange to have the corporation purchase a building which some other manufacturing or commercial concern (hereinafter referred to as the user) desired to lease; on occasion, the seller was the user itself. Then, within several days, and, more often, on the same day, all of the following transactions would take place: (1) The seller would convey the property to the financing corporation; (2) the financing corporation would enter into a lease with the user; and (3) the financing corporation would then sell its own negotiable interest-bearing corporate notes in an amount equal to the purchase price to an institutional lender (or lenders, as the case might be) pursuant to a note purchase agreement (as the document was usually called), which would provide that the notes be secured by

a first mortgage (which sometimes took the form of a deed of trust), and by an assignment of the lease.

The mortgage notes provided for payment to be made over a period equal to or less than the primary term of the lease and the financing corporation was also obligated to pay for all of the lender's out-of-pocket expenses, including legal fees.

The mortgage was a lengthy, detailed document covering almost every conceivable contingency. It spelled out in great detail the terms of payment and right of prepayment, the rights of the parties in case of default, and the responsibilities and limitations of the financing corporation under the agreement. More specifically, the corporation promised to maintain its existence and to refrain from any business activity whatsoever except that which arose out of the ownership and leasing of the property. Payments by the lessee were to be made directly to the mortgagee (or trustee) in satisfaction of payments on the secured notes. Moneys received under the lease were to be first applied to payment on the mortgage notes with the remainder to be paid over to the financing corporation. Provision was made as to the circumstances under which the corporation could sell or transfer the property, the transferee being required to assume all obligations under the mortgage and lease except that the transferee assumed no personal financial obligation for the payment of principal and interest or any other monetary judgment, liability on such assumption being limited to the property transferred. The transferee was also required to compel the financing corporation to maintain its existence, prevent it from engaging in any business other than that arising out of the property and lease thereon, cause such corporation to maintain books available for inspection by the mortgagee, and prevent any merger or consolidation by such corporation with any other corporation.

The lease was for a primary term at least equal to, and, on occasion, in excess of, the period of the mortgage note. Provision was also made for payment by the lessee of all taxes, insurance, repairs, etc., and all costs of acquisition save the purchase price incurred by the lessor— i.e., it was a net lease. The lessee's right and interest in the property, easements, or appurtenances were subordinated to the mortgage. Payments under the lease were to continue even if the building was destroyed; the lessee had the right to purchase the property in such event for a price set in accordance with a schedule attached to the lease which approximated the amount required from the lessor to prepay the note. Refusal to accept the offer of purchase would result in the termination of the lease. The lessee further agreed to indemnify the lessor from any liability resulting from any occurrence on the premises or because of the work being done on the premises by the lessee. The lessee was permitted to sublease the premises or any portion thereof, and he was permitted to assign his interest in the lease, provid-

ing the sublessee or assignee promised to comply with the terms of the mortgage and the lease and further providing the lessee remain personally liable for the performance of all its obligations under the lease.

Upon the completion of the foregoing, the financing corporation would convey the property to its shareholders for "One dollar and other valuable consideration," subject to the lease and the mortgage and without any cash payment or promise thereof by the transferee. Concurrently, the transferee would execute an assumption agreement in favor of the financing corporation, promising to assume all of the financing corporation's obligations under the lease and the mortgage but limited as aforesaid.

The particulars of the various transactions, insofar as they are material to the within case, are summarized in the following chart and the qualifications thereafter set forth:

| Property and (financing corporation) | Nature of improvement | Purchase price | Financing | Lessee | Lease base term (years) | Lease renewal term | Annual rental |
|---|---|---|---|---|---|---|---|
| Colton, Cal. (Stonbernardino Properties, Inc.) | Bank bldg. | $250,835 | $250,000—secured by 5% mortgage notes | American National | 26 | 3 successive 10-year terms at $5,000 annually | $17,048.45 |
| Silver Spring, Md. (Instrument Properties, Inc.) | Warehouse. | 215,000 | $215,000—secured by 5.25% secured notes | Beckman Properties, Inc. | 28 | 4 successive 5-year terms at $5,375 annually | 14,835.00 |
| Kinney Shoe (Janess Properties, Inc) | Stores | 1,355,500 | $1,355,500—secured by 5% mortgage notes | Kinney Shoe Affiliates | 25 | 3 successive 5-year terms at $37,413 annually | 93,528.00 |
| Muskegon, Mich. (Georgiana Properties, Inc.) | Bank bldg. | 1,650,000 | $1,650,000—secured by 5.25% mortgage notes | National Lumberman's Bank | 30 | 5 successive 5-year terms at reduced rent at % of cost | 107,055.00 |
| San Antonio, Texas (Andrean Properties, Inc.) | Warehouse | 370,000 | $370,000—secured by 5.20% secured notes | Shop-Rite Foods, Inc. | 20 | 4 successive 5-year terms at reduced rent at % of cost | 36,340.00 |
| Rockford, Ill. (North Park Properties, Inc.) | Factory bldg. | 935,000 | $935,000—secured by 5.35% secured notes | National Can Corp. | 25 | 4 successive 5-year terms at reduced rent at % of cost | 65,544.00 |
| Long Island City, New York (East River Properties, Inc.) | Factory bldg. | 2,000,000 | $2,050,000—secured by 6.125% secured notes | National Can Corp. | 28 | 1 ten-year, 3 five-year terms at reduced rent at % of cost | 188,024.00 |
| Etiwanda, Cal. (Fontana Properties, Inc.) | Factory bldg. | 1,550,000 | $1,546,800—secured by 5.80% secured notes | National Can Corp. | 28 | 5 successive 5-year terms at reduced rent at % of cost | 106,950.00 |
| Detroit, Mich. (Milk Properties, Inc.) | Milk processing plant | 2,300,000 | $2,300,000—secured by 6.50% mortgage notes | Borman Food Stores, Inc. | 26 | 1 ten-year, 3 five-year terms at reduced rent at % reduction | 176,120.00 |
| IBM Computer (Bettina Properties, Inc.) | Computer. | 187,935 (9/1) 58,299 (9/30) | $189,500 plus $58,800—secured by a promissory note at 5% int. per year. | Raytheon Company | 8 6 | 5 one-year terms | 40,749.00 |

| Property and (financing corporation) | Fixed mortgage payments—principal and interest, annual | Method of depreciation used | Amount of depreciation claimed | Interest expense | Rent expense | Net loss from property | Date financing and lease arrangements completed | Petitioner's interest in (1) corporation; (2) deed; (3) date of transfer |
|---|---|---|---|---|---|---|---|---|
| Colton, Cal. (Stonbernardino Properties, Inc.) | $16,784 | 150% declining balance | 1963–$2,764 1964–16,128 1965–13,505 1966–11,498 | $679 8,057 7,917 7,760 | $455 5,456 5,455 5,455 | $2,477 12,590 9,828 7,664 | May 31, 1963 | (1) 100% (2) 100% (3) 11/1/63 |
| Silver Spring, Md. (Instrument Properties, Inc.) | 14,304 | Straight line | 1964– 2,656 1965– 3,064 1966– 2,915 | 1,620 2,737 2,693 | ------- 219 13 | 1,185 2,311 1,912 | Feb. 28, 1964 | (1) 25% (2) 25% (3) 2/28/64 |
| Kinney Shoe (Janess Properties, Inc.) | 92,508 | Straight line | 1964– 6,793 1965–23,747 1966–22,876 | 7,924 16,621 16,288 | ------- 220 62 | 3,542 17,206 15,844 | June 12, 1964 | (1) 25% (2) 25% (3) 6/12/64 |
| Muskegon, Mich. (Georgiana Properties, Inc.) | 105,824 | Straight line | 1965–18,912 1966–27,451 | 12,634 21,138 | 3,101 67 | 21,265 21,892 | Sept. 24, 1963 | (1) 25% (2) 25% (3) 9/24/63 |
| San Antonio, Texas (Andrean Properties, Inc.) | 35,732 | Straight line | 1965– 9,607 1966– 6,216 | 3,946 5,910 | 290 3 | 6,252 3,044 | Dec. 28, 1964 | (1) 25% (2) 25% (3) 12/28/64 |
| Rockford, Ill. (North Park Properties, Inc.) | 65,344 | Straight line | 1966–12,056 | 7,425 | 265 | 5,956 | Mar. 31, 1966 | (1) 25% (2) 25% (3) 3/31/66 |
| Long Island City, New York (East River Properties, Inc.) | 188,024 | 150% declining balance | 1966–19,316 | -------------- | -------- | 19,316 | June 22, 1966 | (1) 100% (2) 100% (3) 6/22/66 |
| Etiwanda, Cal. (Fontana Properties, Inc.) | 106,571 | 150% declining balance | 1966–61,378 | 54,272 | -------- | 49,242 | May 17, 1966 | (1) 100% (2) 100% (3) 5/17/66 |
| Detroit, Mich. (Milk Properties, Inc.) | 175,160 | Double declining balance | 1966–31,469 | -------------- | -------- | 31,469 | Aug. 19, 1966 | (1) 100% (2) 25% (3) 9/19/66 |
| IBM Computer (Bettina Properties, Inc.) | Not available | 150% declining balance or double declining balance | 1963–23,239 1964–56,334 1965–42,251 1966–31,688 | -------------- 11,813 10,615 9,105 | -------- -------- -------- | 23,239 27,398 12,117 44 | Sept. 1, 1963 and Oct. 1, 1963 | (1) 100% (2) 100% (3) 9/1/63 and 10/1/63 |

In the Colton, Calif., transaction, the transfer of the property from Stonbernardino Properties, Inc., to petitioner was delayed for 5 months. Also, upon receipt of the deed, petitioner conveyed the underlying land to a third party for $83,923.91 and simultaneously leased the property back for a term equal to that of the primary lease on the building. Petitioner paid a rental equal to 32 percent of the rent received from the lessee of the building less 32 percent of any expenses incurred by Stonbernardino or petitioner in conformity with the mortgage and lease.

In the Kinney Shoe transaction, one of seven parcels acquired by Janess Properties, Inc., was not actually conveyed to it until July 29, 1964, a month and a half after the original transaction was executed. All transfers of the parcel to petitioner and his associates then proceeded as in the model transaction.

In the San Antonio transaction, the initial amount of financing proved inadequate to cover the cost of the facilities built on the property. Therefore, on June 15, 1965, about 6 months after the initial transactions, an additional $100,000 was financed in a manner similar to the initial cost. The mortgage and lease agreements were amended to absorb this cost and Andrean Properties, Inc., was a party to the modification documents.

In the Etiwanda, Calif., and Rockford, Ill., transactions, a separate document was executed purporting to designante the financing corporation as the nomince of petitioner and his associates.

In each instance, the fair market value of the underlying property was at least equal to the face amount of the mortgage, or the unpaid balance thereof, at the date the financing transactions were completed and at the date of the transfers to petitioner and, in some instances, to his associates.

Petitioner reported in the tax returns for the years in question his proportionate share of the income and deductions attributable to the properties after his acquisitions.

## OPINION

The dispute in this case—whether petitioner is entitled to depreciation deductions under section 167 [1] with respect to certain properties— arises from a single factual pattern repeated several times, planned and executed by the petitioner, on each occasion using a different property and different persons in the supporting roles of lessee and mortgagee. In each instance, the petitioner acquired legal title to the property, subject to a long-term lease of the property and a mortgage encumbering the property in respect of which he assumed no personal liability. At the time of petitioner's acquisition, the value of each property at least equaled the unpaid principal amount of the mortgage, and petitioner neither made nor obligated himself to make any cash investment in the property out of his own pocket.

The essential facts of the several transactions are set forth in our findings and include a recital of certain variations in respect of the several properties involved. Neither party argues that these variations should produce different results for a particular piece of property.[2] The two issues upon which resolution of the basic question depends are: (1) Should the corporations from which the petitioner acquired his ownership interest in the properties be recognized as separate viable entities; and (2) if they should be so recognized, are they or

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

[2] They have simply pointed to these variations as supportive of their arguments in respect of the two indicated issues. We will accordingly treat these variations in the same fashion.

the petitioner entitled to an allowance for depreciation and for other related items.

We consider first the viability of the corporations. There is no question that they were organized and utilized in the initial stages for business purposes, namely, to enable the contemplated transactions to produce maximum financing by avoiding State law restrictions on loans to individuals rather than corporate borrowers, to provide a mechanism for limiting personal liability, and to facilitate multiple-lender financing. In furtherance of these purposes, the corporations purchased the properties, entered into the leases, issued their corporate obligations, and executed mortgages and assignments of the leases as security for the payment of those obligations. At that point of time the corporations were undoubtedly separate viable entities whose separate existence could not be ignored for tax purposes. *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943). The activities of the corporations involved in *Jackson* v. *Commissioner*, 233 F. 2d 289 (C.A. 2, 1956), *O'Neill* v. *Commissioner*, 170 F. 2d 596 (C.A. 2, 1948), and *Dallas Downtown Development Co.*, 12 T.C. 114 (1949), relied upon by petitioner, were far less by comparison; those cases are therefore distinguishable. Nor do we think the record herein can support petitioner's assertion that, in engaging in the aforementioned transactions, the corporations were merely acting as agents or nominees.[3] *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949) ; *Taylor* v. *Commissioner*, 445 F. 2d 455 (C.A. 1, 1971), affirming a Memorandum Opinion of this Court; *Fort Hamilton Manor, Inc.*, 51 T.C. 707, 719–720 (1969), affd. 445 F. 2d 879 (C.A. 2, 1971). Compare *Paymer* v. *Commissioner*, 150 F. 2d 334 (C.A. 2, 1945), reversing in part a Memorandum Opinion of this Court on facts distinguishable from those involved herein. Indeed, the existence of an agency relationship would have been self-defeating in that it would have seriously endangered, if not prevented, the achievement of those objectives which, in large part, gave rise to the use of the corporations, namely, the avoidance of restrictions under State laws.

We still must determine, however, 'whether the corporations should be recognized as separate viable entities after the transfers of the properties in question. At that point, they were stripped of their assets and, by virtue of their undertakings, could not engage in any other business activity. On the other hand, the corporations continued to be liable on their obligations to the lenders and were required, under the

---

[3] In the case of the Etiwanda, Calif., and the Rockford, Ill., properties, there is nominee language in the pertinent documents, but, in our opinion, such language does not overcome the numerous other elements which have a more than counterbalancing effect. See *Fort Hamilton Manor, Inc.*, 51 T.C. 707 (1969), affd. 445 F. 2d 879 (C.A. 2, 1971). In any event, as we have previously pointed out, neither party has sought separate treatment for particular transactions.

terms of those obligations, to remain in existence, to abide by certain other undertakings, and to preserve their full powers under the applicable State laws to own property and transact business. Moreover, the transferees of the properties agreed to cause the corporations to comply with their undertakings, albeit that any claim for breach of such agreement was limited to the property and could not constitute a basis for the assertion of personal liability. Finally, we note that, in the case of the San Antonio property, the corporation participated in refinancing arrangements subsequent to the transfer to petitioner.

Under the foregoing facts and based upon the record before us, the circumstances herein do not constitute an exception to the following test enunciated in *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. at 438–439, and we hold that the corporations continued to be separate viable entities for tax purposes: [4]

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Citations omitted.]

On the same basis, we conclude that the corporations cannot be considered as agents of the transferees during the period following the transfers.

Having held that the corporations should be treated as separate viable entities at all times pertinent herein, we are required to decide the second issue raised by the parties—whether petitioner as a transferee of the properties in question is entitled to the deduction for depreciation. Resolution of this issue depends upon who has the depreciable interest in the properties, the corporations or the petitioner,[5] and, in the event that it is the petitioner, the measure of his basis. The key to our decision ultimately lies in a determination of the extent to which the doctrine of *Crane* v. *Commissioner*, 331 U.S. 1 (1947), applies.

We turn first to a consideration of the nature of the interest which the petitioner acquired. Petitioner contends that he and his associates acquired both legal title and full beneficial ownership of the properties from the corporations. Respondent counters with the assertion

---

[4] In so concluding, we have taken into account that, in situations such as are involved herein, the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted. See *Commissioner* v. *State-Adams Corporation*, 283 F.2d 395, 398–399 (C.A. 2, 1960). Compare *Higgins* v. *Smith*, 308 U.S. 473 (1940); *Aldon Homes, Inc.*, 33 T.C. 582, 596 (1959).

[5] Respondent concedes that the leases involved should be recognized as such and makes no argument that the lessees are the ones to whom the benefit of a depreciation deduction should inure. Cf. *Helvering* v. *Lazarus & Co.*, 308 U.S. 252 (1939).

that, because of the long-term leases and the commitments of the rentals to the payment of the mortgages by virtue of the assignments of the leases which were consummated prior to the execution of the deeds, the conveyances by each corporation transferred only a reversionary interest in the buildings [6] and that consequently petitioner did not acquire a present interest in the properties which may be depreciated for income tax purposes. We agree with petitioner.

Implicit in respondent's position is the concept that, by virtue of the leases and financing transactions, the corporations divested themselves of all but bare legal title to the properties. Following this concept to its logical conclusion would require a determination either that the corporations thereby deprived themselves of any presently depreciable interest or that their right to deduct the cost of the buildings should be by way of amortization over the lease terms. But both possibilities are belied by respondent's basic argument that the corporations retained such an interest in the properties as against their transferees that they, and not the latter, should be held accountable for the income from the properties and be entitled to the depreciation deduction.[7] Compare *Harriet M. Bryant Trust*, 11 T.C. 374 (1948). See also sec. 1.167(a)-4, Income Tax Regs. (capital expenditures for buildings by a lessor are recoverable through depreciation allowances over the life of the buildings and not the term of the lease). The assignments of the leases, like the mortgages, were transfers solely for security and did not relieve the corporations from being charged with the rents for income tax purposes. *Ethel S. Amey*, 22 T.C. 756 (1954). Each lease was part and parcel of the ownership of the particular property the legal and beneficial ownership of which was vested at the outset in the appropriate corporation. Cf. *LeBelle Michaelis*, 54 T.C. 1175 (1970). It is this critical factor which distinguishes the cases, relied upon by respondent, dealing with the right of a lessor to depreciate buildings constructed on his land by the lessee. The lessee, by virtue of his expenditure, was clearly entitled either to depreciation of the building or amortization of its costs over the term of the lease. The question presented was whether the lessor, as the legal owner of the building, could also claim depreciation. Thus, unlike the instant situation, where both parties agree that only the corporations or the transferees, but not both, are entitled to depreciation, the courts were faced with the possibility of a double deduction. The beneficial ownership of the buildings was held to be vested in the lessee and the technical vesting of legal title in the lessor by virtue of the ownership of the land

---

[6] Respondent does not indicate his position vis-a-vis the land involved, presumably because it is in any event not subject to an allowance for depreciation.

[7] As previously pointed out, respondent does not attack the validity of the leases. See fn. 5 *supra*.

was not deemed sufficient to permit the conclusion that the lessor had a depreciable interest. See the discussion in *World Publishing Co.* v. *Commissioner*, 299 F. 2d 614 (C.A. 8, 1962), reversing 35 T.C. 7 (1960), and in *Albert L. Rowan*, 22 T.C. 865 (1954). See also *Buzzell* v. *United States*, 326 F.2d 825 (C.A. 1, 1964); *Catharine B. Currier*, 51 T.C. 488 (1968). Such lack of depreciable interest in the lessor has generally been the foundation for denying a depreciation allowance to the lessor's transferee—at least where the transfer was by way of inheritance. *Albert L. Rowan, supra,* and cases cited therein.[8]

In short, as we see the situation, the real question to be decided is what was petitioner's basis in each of the properties. Before proceeding to a discussion of this question, we need to dispose of certain preliminary contentions on the part of respondent. First, he contends that petitioner has not proved by what means he acquired his claimed interests in the properties—whether as a purchaser or as a shareholder in receipt of corporate distributions by way of dividends, in liquidation, or otherwise. Ancillary to this argument and also in an attempt to avoid the impact of *Crane* v. *Commissioner, supra,* respondent argues that petitioner has failed to prove that the fair market value of the properties, at the time of his acquisition, was equal to or in excess of the face amounts of the mortgages. In respect of the latter contention, whatever may be the state of the record herein as to the value of the properties without regard to the leases or at dates subsequent to those on which the corporations made the transfers, we are satisfied both independently on the facts revealed by the record and also on the basis of respondent's stipulation at the trial that, at the time of transfer by the corporations, the fair market value of each property, taking the existing lease into account (cf. *LeBelle Michaelis, supra*), at least equaled the remaining principal balance of the unassumed mortgage. Such being the case and considering the fact that neither party claims any value in excess of such unpaid balance, it seems clear to us that if that unpaid balance is deemed part of petitioner's basis, that cost and the fair market value of each property will be in the same amount and it will be immaterial whether petitioner's basis is determined under section 1012 (cost) or under section 301(d) or 334(a) (fair market value). It is, therefore, unnecessary for petitioner

---

[8] In this connection, we note that the position of the lessor is sometimes also discussed in terms of his not having any basis. What is more, such discussion sometimes confuses the two questions, i.e., existence of a depreciable interest and the measure of basis, of which respondent's briefs herein furnished an excellent example. See also, e.g., *M. De Matteo Construction Co.* v. *United States*, 433 F. 2d 1263 (C.A. 1, 1970). Where the transfer is by way of sale, the authorities are divided. Compare *World Publishing Co.* v. *Commissioner*, 299 F. 2d 614 (C.A. 8, 1962), reversing 35 T.C. 7 (1960), with *M. DeMatteo Construction Co.* v. *United States, supra.* Since, in our view, the instant case is distinguishable, we need not now decide which line of authority to follow.

to prove, or for us to decide, whether petitioner took title as purchaser or shareholder.

This brings us to the final question to be considered, namely, should the unpaid balance of each mortgage be deemed part of petitioner's basis even though petitioner and his associates assumed no liability in respect thereto. Had petitioner accepted personal liability for the mortgage debt, instead of merely taking the leased property subject to the lien but without personal liability, there would be no legitimate question that the debt as assigned was part of the basis of the property. Thus, the issue is whether the absence of such personal liability should produce a different result. In *Crane* v. *Commissioner*, *supra*, the Supreme Court held that the amount of a mortgage encumbering inherited property should be included in the devisee's basis for such property, whether or not the devisee assumes personal liability for the mortgage. In *Blackstone Theatre Co.*, 12 T.C. 801 (1949), we applied the doctrine of *Crane* to a purchase and held that the amount of an unassumed lien on acquired property should be included in the cost of the property. Cf. *Parker* v. *Delaney*, 186 F. 2d 455 (C.A. 1, 1950). We reiterated this conclusion in *Manuel D. Mayerson*, 47 T.C. 340 (1966), where a purchase-money mortgage without personal liability was included in the amount of basis for purposes of depreciation. In so doing, we were not deterred by the fact that the taxpayer made only a nominal cash investment. We explained that the effect of the *Crane* doctrine is:

to give the taxpayer an advance credit for the amount of the mortgage. This appears to be reasonable, since it can be *assumed* that a capital investment in the amount of the mortgage will eventually occur despite the absence of personal liability. * * * [See 47 T.C. at 352. Emphasis added.]

Respondent argues that such an assumption is unreasonable under the facts of the present case. He asserts that petitioner has no reason to protect his interest in the property involved herein, since his cash flow is minimal and the property is mortgaged to the full extent of its value. Such assertion ignores the fact, however, that petitioner's equity in the property increases as the rents under the lease are paid in amortization of the mortgage. This increase in equity will benefit petitioner either by way of gain in the event of a sale or the creation of refinancing potential. Moreover, petitioner will seek to protect his interest in the property in order to retain the benefits of any appreciation in its fair market value.

To claim, as respondent does, that petitioner will be making no investment in the property during the term of the lease merely begs the question. The rents are includable in his income even though they are assigned as security for the payment of the mortgage. See *Ethel S. Amey*, *supra*. As we stated in the *Mayerson* case, the *Crane* doctrine

permits the taxpayer to recover his investment in the property before he has actually made any cash investment. Every owner of rental property hopes to recoup his investment, plus a profit, from the receipt of rental income. In the normal case, he applies part of this income to the amortization of any mortgage encumbering the leased property, retaining any excess over the mortgage payments as his cash flow. As *Mayerson* makes clear, petitioner's case should not be treated differently merely because his acquisition of the property is completely financed and because his cash flow is minimal.

Similar reasoning disposes of respondent's argument that, under the circumstances of this case, the likelihood that petitioner will ever be called upon to make any payments on the mortgages is so speculative as to require that the mortgage obligation be characterized as a contingent obligation and not included in cost under the principle enunciated in *Columbus & Greenville Railway Co.*, 42 T.C. 834 (1964), affd. 358 F. 2d 294 (C.A. 5, 1966) ; *Albany Car Wheel Co.*, 40 T.C. 831 (1963), affd. 333 F. 2d 653 (C.A. 2, 1964) ; and *Lloyd H. Redford*, 28 T.C. 773 (1957). We dealt with those cases in *Mayerson* and distinguished them on the ground that the underlying obligations, *by their terms*, were contingent. See 47 T.C. at 353–354. Such is not the situation herein.

Finally, our finding that the unpaid principal balance of each mortgage was equivalent with the fair market value of the property at the time of transfer by each corporation obviates the need to consider whether the *Crane* doctrine should apply where that circumstance does not exist. See *Crane* v. *Commissioner*, 331 U.S. at 12, fn. 37; *Parker* v. *Delaney*, 186 F. 2d at 458; compare *Edna Morris*, 59 T.C. 21 (1972).

The combination of the benefits of accelerated depreciation and the *Crane* doctrine produces a bitter pill for respondent to swallow. We see no way of sugarcoating that pill, short of overruling *Crane* v. *Commissioner*, *supra*, which we are not at liberty to do.[9]

Because of the various concessions made by the parties and to reflect our conclusions herein,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

———

Scott, *J.*, dissenting: I respectfully disagree with the conclusion of the majority in this case since in my view petitioner and his associates

---

[9] *Crane* has been the subject of extensive discussion, some of it critical. See Andrews, "Personal Deductions in an Ideal Income Tax," 86 Harv. L. Rev. 309, 379, fn. 122 (1972) ; Perry, "Limited Partnerships and Tax Shelters : The Crane Rule Goes Public," 27 Tax L. Rev. 525 (1972) ; Adams, "Exploring the Outer Boundaries of the Crane Doctrine : An Imaginary Supreme Court Opinion," 21 Tax L. Rev. 159 (1966).

were merely owners of an equity or stock interest in the various corporations.

GOFFE, J., agrees with this dissent.

———

QUEALY, J., dissenting: If compelled to travel the same route taken by the majority, I would nevertheless reach a different conclusion. My disagreement with the majority, however, goes deeper than that. As Appellate Judge Rives aptly observed in *Davant* v. *Commissioner*, 366 F. 2d 874, 879 (C.A. 5, 1966), our decision should be compatible with the statute as a whole. He said:

> We stand now at the threshold of our travel through the detailed and complex Code provisions that must govern our determination. Before we embark upon that journey it is well to restate the general principle that rules prescribed by Congress in the Code are often wholly reasonable and appropriate when taken in isolation, but that fact alone should not and must not prevent a court from harmonizing these apparently divergent elements of specific policy so that they may continue to cohabit the same body of general law which Congress has directed shall be viewed as a single plan. As Mr. Justice Frankfurter so aptly stated [*Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, 489 (1951)], "There are no talismanic words that can avoid the process of judgment." [Fn. omitted.]

We should not be diverted by "mere formalities" designed to make a transaction appear to be other than what it was in order to achieve a tax result. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945). Rather than be concerned with the separate steps in the "paper jungle," I would look to the position of the parties when the transaction has been completed. I would thus be guided by a long line of cases following *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942), holding that a connected series of acts must be construed as a single transaction and so judged under the internal revenue laws. Applying these principles to the facts in this case, it is my opinion that when all of the so-called paper work is considered, the interests acquired by the petitioner and his associates must be deemed to constitute an equity or stock interest in a taxable association.

The transactions which are involved in this proceeding followed a common pattern. The petitioner would contact a commercial or manufacturing corporation which either had or was in the process of acquiring a facility. Petitioner would thereupon negotiate the terms of an agreement whereby the user of the facility would sell the property and lease it back under a long-term lease at a rental adequate to support the financing of the full amount of the purchase price. The petitioner would then cause to be organized a "financing corporation" which would take title to the property, enter into the lease with the user, and issue its notes to a lending institution, secured by a mortgage on the

property and assignment of the lease, in order to obtain the funds for the purchase. As security for its notes, the financing corporation would convey to a trustee all its right, title, and interest in and to the property, including all rents and income therefrom. The financing corporation further covenanted to preserve its existence as a corporation and to keep in full force and effect its right to own such property and to transact business for so long as the notes were outstanding.

As an integral part of the transaction, the petitioner simultaneously had the financing corporation execute a deed purporting to transfer the property to the petitioner and his associates. The petitioner and his associates then entered into an assumption agreement whereby they agreed to be bound by the terms and conditions of the deed of trust, the lease and its assignment, together with any other obligations imposed on the financing corporation except that they assumed no obligation for the payment of principal and interest on the notes or any monetary judgment resulting therefrom.[1]

The use of the financing corporation enabled the petitioner *inter alia* (1) to obtain from institutional lenders a loan for the full amount of the purchase price, (2) to avoid any personal liability on account of such financing, (3) to increase the marketability of the financing, and (4) to avoid any restrictions applicable under State laws in the case of individual borrowers. In addition, the holding of title and the execution of the lease in the name of the financing corporation enabled the petitioner to create subordinated fractional interests which could be transferred without affecting the continuity of the mortgage, deed of trust, lease, and the like.

In the internal revenue laws, the term "corporation" is not limited to what might be considered a corporation organized under State law. Sec. 301.7701–1, Proced. & Admin. Regs. Section 7701(a)(3) provides: "CORPORATION.—The term 'corporation' includes associations, joint-stock companies, and insurance companies."

In his regulations, the respondent has enumerated the major characteristics of an entity taxable as a corporation under section 7701(a)(3), as follows:

Sec. 301.7701–2 Associations, including organizations labeled "corporations."— (a) *Characteristics of corporations.* (1) The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide

---

[1] In reality the so-called assumption agreements were little more than "window dressing," since the participants were not subject to any monetary liability. It is questionable whether such agreements served any useful purpose other than to bind petitioner and his associates together in a common business enterprise.

the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph, other factors may be found in some cases which may be significant in classifying an ogranization as an association, a partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey et al. v. Commissioner (1935) 296 U.S. 344.

In *Morrissey* v. *Commissioner*, 296 U.S. 344 (1935), the Supreme Court not only confirmed the authority of the respondent to issue such regulations, but approved the enumerated characteristics as appropriate criteria in determining whether a business entity or association, whether incorporated or otherwise, is to be treated as a taxable entity under section 7701(a)(3), separate and apart from its shareholders or participants. It thus becomes a question whether taking the enterprise as a whole, and looking to the characteristics enumerated, it more closely resembles a corporation than a partnership, trust, or proprietorship. If so, the interests acquired by the petitioner and his associates would be that of "stockholders" as distinguished from owners of the property. *Morrissey* v. *Commissioner, supra; Bloomfield Ranch* v. *Commissioner*, 167 F. 2d 586 (C.A. 9, 1948).

The mechanics were such that the petitioner had provided continuity in the form of a corporation organized to take title to the property, limited liability on the part of the participants who held an undivided interest in the property, centralized management in that as the principal officer of the corporation petitioner conducted all negotiations and made all decisions; and, transferability of interest on the part of participants without affecting the obligations with respect to the property all of which had been undertaken in the name of the corporation. These objectives could only be achieved through an entity which would provide the continuity of ownership, centralization of control, and limitation of liability that are characteristic of the corporate form.

Contrary to the opinion of the majority, fractional interests were not necessarily issued upon the basis of formal ownership of the stock in the financing corporation. Under the opinion of the majority, the corporation was immediately stripped of all its assets. The stockholders of record owned mere pieces of paper. The real equity in the financing corporation was represented by the deeds transferring fractional interests to the petitioner and his associates, not by the shares of stock. Thus, when we look to the transaction as a whole, there are

present all of the characteristics enumerated by the respondent in section 301.7701-2, Proced. & Admin. Regs. Such entity must be recognized under the internal revenue laws as a "taxpayer" distinct and apart from the petitioner and his associates. Both the income and deductions reflected by the petitioner in his individual returns were chargeable to that "taxpayer." *Morrissey* v. *Commissioner, supra; Kurzner* v. *United States*, 413 F. 2d 97 (C.A. 5, 1969).

I must also disagree with the opinion of the majority in its application of the law to the separate components of the transactions presented here. While *Crane* v. *Commissioner*, 331 U.S. 1 (1947), holds that a taxpayer is entitled to include in his basis for purposes of depreciation a bona fide indebtedness encumbering the property at the time acquired, it is axiomatic for the application of this rule that the indebtedness is discharged by the taxpayer either directly with his own funds or out of taxpayer's interest in the income from the property. Where a taxpayer neither puts up his own funds nor is chargeable with the income used to discharge the indebtedness, such taxpayer never acquires a basis in the property.

The identity and continued role of the financing corporation as mortgagor and lessor of the property was essential. Under the terms of the loan agreements, the mortgage notes were required to be maintained as the direct obligation of the issuing corporation. Any income designated to the payment thereof would necessarily be chargeable in the first instance, at least, to such corporation.

If the deeds granting the petitioner and his associates fractional interests in the properties effectively transferred ownership thereof from the financing corporations, those corporations would be stripped of all of their assets. The financing corporation would be an empty shell. While the majority thus purports to recognize that such corporations were at all times viable entities for tax purposes, the ultimate decision of the majority is incompatible with that principle. To put the matter simply, having transferred its entire interest in the leasehold to a trustee to collect the rents and pay its indebtedness, I would regard the documents purporting to transfer the property to the petitioner and his associates as carrying no present interest. The petitioner had no present interest in the property which was subject to depreciation. *M. DeMatteo Construction Co.* v. *United States*, 433 F. 2d 1263 (C.A. 1, 1970).[2]

The position of the petitioner and his associates was no different than that of an owner of land who leases it to another under an agree-

---

[2] In this respect, the facts are distinguishable from *World Publishing Co.* v. *Commissioner*, 299 F.2d 614 (C.A. 8, 1962). In that case, the taxpayer acquired by purchase the entire interest of the lessor. Since that interest included both the land and a building erected thereon by the lessee, it was held that the taxpayer acquired a depreciable interest in the building.

ment whereby the lessee will cause a building to be erected on the land. The lessee goes out and obtains a loan secured by a mortgage on his leasehold interest, including the building. The income or rents from the property are then applied, in part, to amortize this loan. When the ground lease expires, the owner of the land will get back his land, together with the building. Some day, the landowner will get it all. The petitioner has the same expectations. During the intervening period, however, the rents are not taxable to him merely because of their application to the discharge of an indebtedness which encumbers the property. Neither has sustained any depreciation. For example, see *Schubert* v. *Commissioner*, 286 F. 2d 573 (C.A. 4, 1961), affirming 33 T.C. 1048 (1960); *Reisinger* v. *Commissioner*, 144 F. 2d 475 (C.A. 2, 1944); *Albert L. Rowan*, 22 T.C. 865 (1954).

GOFFE, *J.*, agrees with this dissent.

---

GOFFE, *J.*, dissenting: As indicated, I agree with the views of Judge Quealy expressed in his dissenting opinion. I feel, however, that some additional comment is warranted as to the substance of the steps comprising the pattern utilized by petitioners.

In order to make the pattern work from a business standpoint, the corporate form had to be adopted; it was indispensable. Not only did the corporation have to be organized; it had to continue in existence until the indebtedness was extinguished. After title was transferred to the individuals, the corporation continued to own the most valuable present right in the property, the right to the income which would extinguish the indebtedness. Because of this I feel that attention should be focused on the transfer of title from the corporation to the individuals. The transfer of title served no business purpose; it transferred the only revenue-producing asset of the corporation but was not even supported by action of the board of directors in order to give the transfer an aura of respectability. It was nothing more than an integrated step in the "paper work." Assuming that the parties intended the transfer of title to be a dividend, they did not even carry out the necessary steps to make it look like a dividend.

After the transfer of title the corporation continued to be liable on the debt and the individuals were not monetarily liable.

I conclude that the transfer of title was for the sole purpose of passing on to the individuals a deduction for accelerated depreciation in excess of the income from the property. Furthermore, I do not see how the reporting of income by the individuals adds any strength to petitioners' case. In my view both the income and the deductions belong to the corporation.

I conclude that the transfer of title was nothing more than a device to secure for the petitioners the benefits of subchapter S status which they could not otherwise enjoy. *Gregory* v. *Helvering*, 293 U.S. 465

(1935). I do not believe petitioners should be able to accomplish by indirect means what they could not do directly. I would, therefore, disallow the deduction for depreciation to the individuals.

WILES, *J.*, agrees with this dissent.