LOUIS STEINMETZ, Transferee, Et Al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Steinmetz v. Commissioner
Docket Nos. 3978-69, 3979-69, 3980-69, 3987-69, 3988-69, 4000-69, 4001-69, 4002-69, 4003-69, 4004-69, 4005-69, 4006-69, 4007-69, 4008-69, 4009-69.
United States Tax Court
T.C. Memo 1973-208; 1973 Tax Ct. Memo LEXIS 79; 32 T.C.M. (CCH) 969; T.C.M. (RIA) 73208; September 19, 1973 Filed *79 Income resulting from condemnation of two adjacent parcels of real property held not taxable to a corporation whose only function was to create an identity of interest in the two parcels. Beneficial ownership rested in the individual participants, to whom the income and expenses of the properties were properly chargeable. Moline Properties v. Commissioner, 319 U.S. 436 (1943), inapplicable. 2 Leon M. Kerry, for petitioners in docket Nos. 3978-69, 3979-69, and 3980-69. Robert L. Klein, for petitioners in docket Nos. 3987-69 and 3988-69. Saul L. Harris and Jesse Fishkin, for petitioners in docket Nos. 4000-69, 4001-69, 4002-69, 4003-69, 4004-69, 4005-69, 4006-69, 4007-69, 4008-69, and 4009-69. Stanley J. Goldberg, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT *80 AND OPINION QUEALY, Judge: Respondent has determined deficiencies in income taxes and an addition to the 3 tax pursuant to section 6651(a) [2] for the taxable year 1963, as follows: Docket No.
Petitioner
Deficiency
Addition to the Tax,§6651(a)
3979-69
Louis Steinmetz and Ethel Steinmetz
$80,832.04
3980-69
West Shore Martin, Inc.
109,657.42
$27,414.36
3988-69
Estate of Benjamin Weir, Deceased, Joseph Goldstein, Executor, and Rose Weir
2,162.11
4003-69
Estate of Harry Liebowitz, Deceased, Jerry Liebowitz and Harry Schwartz, Executors, and Estate of Jennie Liebowitz, Deceased, Jerry Liebowitz, Executor
1,264.04
4005-69
Nathan Slewett and Evelyn Slewett
607.25
4009-69
Estate of Eli Miller, Deceased Nathan Slewett, Executor
1,287.84
Respondent has also determined that the following petitioners are liable as transferees of the assets of 4 West Shore Martin, Inc., Transferor, as follows: Docket No.
Petitioner
Amount of Transferor's deficiency and addition to tax asserted as Transferee Liability 3978-69
Louis Steinmetz, Transferee
$137,071.78
3987-69
Estate of Benjamin Weir, Deceased, Joseph Goldstein, Executor
67,504.00
4000-69
Milton Levin, Transferee
32,064.00
4001-69
Maurice Gruber, Transferee
24,189.00
4002-69
Estate of Harry Liebowitz, Deceased, Jerry Liebowitz, Executor, and Harry Schwartz, Executor, Transferee
28,127.00
4004-69
Nathan Slewett, Transferee
14,063.00
4008-69
Estate of Eli Miller, Deceased, Nathan Slewett, Executor, Transferee
45,002.00
*81 In addition, respondent has determined that a Trust Under the Will of Eli Miller, Deceased, Nathan Slewett, Trustee, Transferee, the petitioner in docket No. 4007-69, is liable as the transferee of the assets of the Estate of Eli Miller, Deceased, docket No. 4008-69, transferee of the assets of West Shore Martin, Inc., Transferor, docket No. 3980-69, in the amount of $45,002. 5 Respondent has also determined that a Trust Under the Will of Eli Miller, Deceased, Nathan Slewett, Trustee, Transferee, the petitioner in docket No. 4006-69, is liable as a transferee of the assets of the Estate of Eli Miller, Deceased, Transferor, docket No. 4009-69, in the amount of $1,387.84. Commendably, the parties have disposed of numerous issues herein by agreement. [3] The principal question 6 remaining for decision is whether West Shore Martin, Inc., the petitioner in docket No. 3980-69, is to be taxed upon the proceeds of a condemnation award received from the City of New York relative to certain real property. *82 If the Court should determine that West Shore Martin, Inc., is taxable on the condemnation proceeds, the following remain for consideration: (1) Whether West Shore Martin, Inc., docket No. 3980-69, is liable for the addition to the tax provided by section 6651(a). (2) The amount of the transferee liability, if any, of the Estate of Benjamin Weir, Deceased. Adjustments in the statutory notices issued to the respective petitioners not in issue will be deemed to have been conceded by the petitioners. 7 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, West Shore Martin, Inc. (hereinafter referred to as "West Shore") was a corporation organized under the laws of the State of New York on October 26, 1959, and was dissolved on December 15, 1967. At the time of the filing of its petition herein, said petitioner's address was c/o Milton Levin, Great Neck, New York. West Shore did not file a corporate income tax return for the taxable year 1963. At the time of the filing of the petitions herein, the individual petitioners in docket Nos. 3978-69, 3979-69, 3987-69, 3988-69, 4000-69, 4001-69, 4002-69, and *83 4003-69 legally resided within the State of New York. All required income tax returns of the petitioners in the aforementioned dockets were duly filed for the taxable year 1963 with the district director of internal revenue, Brooklyn, New York. 8 At the time of the filing of the petitions herein, the individual petitioners in docket Nos. 4004-69, 4005-69, 4006-69, 4007-69, 4008-69, and 4009-69 legally resided within the State of Florida. All required income tax returns of the petitioners in the aforementioned dockets were duly filed for the taxable year 1963 with the district director of internal revenue, Jacksonville, Florida. In early 1956, Louis Steinmetz and Ethel Steinmetz, husband and wife, owned in fee a parcel of real property located on the southerly side of 90th Avenue and Parsons Boulevard, Jamaica, Queens County, New York. Their son, Max Steinmetz, was and is an attorney at law engaged in the real estate and building business. Max represented his parents as attorney in fact in their real estate matters in general, and their interests in the above-mentioned property specifically. Max did not have an interest in said property as a principal. 9 On *84 May 21, 1956, Max and Louis Steinmetz, as landlords, executed a long-term (75 years) lease to Parsons Parking Terminals, Inc., as tenant on said property. On or about May 1, 1958, Parsons Parking Terminals, Inc., sold and transferred a sublease on said property to Galbet Corp. for a consideration of $66,683.50 subject to notes payable in the amount of $25,370. The stockholders of Galbet Corp. and their respective holding of its 200 shares of outstanding capital stock were: Ben Weir
60 shares
Fanny Levin
50 shares
Eli Miller
40 shares
Harry Liebowitz
25 shares
Nathan Slewett
25 shares
Milton Levin (hereinafter referred to as "Levin"), an attorney specializing in real estate transactions, represented Galbet Corp. and the above individuals as their attorney. 10 Prior to May 24, 1960, Galbet Corp. owned in fee a second parcel of real property immediately contiguous to the Steinmetz property. That parcel and the leasehold were acquired by Galbet Corp. for the purpose of erecting a building thereon. Both properties were operated by Ben Weir, one of the stockholders of Galbet Corp., as a parking lot. Weir was to operate the parking lot and to *85 collect the income therefrom out of which he was to pay all of the expenses thereof and of the corporation including taxes, mortgage payments, interest, etc., and pay over the balance to the corporation prior to June 29, 1960, and to certain tenants in common thereafter. A license was required to operate the parking lot and only Weir had obtained such a license. There was continuous financial discord between Weir and the other stockholders of Galbet as to his method of handling funds, his irregular accountings, his failure to pay the obligations incumbent upon him under the agreement, such as real estate taxes and the interest and principal payments on the mortgages. Steinmetz was not involved in these disputes in any manner. 11 Commencing in 1958 and continuing thereafter, numerous articles were published in the local newspapers reporting the possibility that the parcels owned by Louis and Ethel Steinmetz and Galbet might be taken by the City of New York by condemnation. Those accounts seen by Max Steinmetz were clipped from the newspapers and sent to a law firm specializing in condemnation law, Romano and Schenker, whose advice was sought relative to the condemnation.
*86 At approximately the same time, Milton Levin, the attorney for Galbet Corp. began having reservations about Galbet's plans for building on the parcels. He felt that the newspaper accounts of the possible condemnation would frustrate any attempt to obtain financing or a building permit. Prior to the eventual condemnation of the subject properties, Max Steinmetz was advised by Joseph Romano that the amount of the condemnation award would be reduced on account of the lease held by Galbet. Ramano proposed to work out an arrangement whereby the two 12 separate interests in the contiguous parcels were united, with a view to increasing the amount of the condemnation award. Insofar as the condemnation proceedings were concerned, Romano regarded the form of ownership to be irrelevant. For his purposes, a partnership, joint venture, or some other form of ownership was just as good as a corporation. Accordingly, Romano met with Max Steinmetz and Milton Levin to discuss their respective positions vis-a-vis the condemnation. It was agreed that the lease would be terminated and an identity of interest created in the subject properties. On May 4, 1960, the New York City Planning *87 Commission formally adopted a resolution recommending the acquisition of the two adjacent properties, together with all buildings and improvements thereon. Consistent with their understanding, the owners of the adjacent parcels entered into two agreements dated May 24, 1960. The first of those two agreements provided in pertinent part: WHEREAS, LEVIN represents and is acting as attorney for BEN WEIR, FANNY LEVIN, ELY [sic] MILLER, HARRY LEIBOWITZ [sic] and NATHAN SLEWETT; and 13 WHEREAS, the total authorized and issued capital common stock of GALBET CORP. is 200 shares; and * * * WHEREAS, STEINMETZ represents and is attorney for himself, LOUIS STEINMETZ and ETHEL STEINMETZ; and WHEREAS, MAX, LOUIS and ETHEL STEINMETZ own in fee premises described in Schedule "A" [one of the subject parcels] annexed hereto and made part of this agreement; and WHEREAS, both LEVIN and STEINMETZ have been fully authorized by the parties each represents to enter into this agreement; and WHEREAS, STEINMETZ has proposed to LEVIN that the persons he represents shall convey to GALBET CORP. the fee to the premises described in Schedule "A" hereof upon the terms and conditions hereinafter *88 set forth in this agreement; and WHEREAS, the persons LEVIN represents are willing to have GALBET CORP. accept such conveyance and are willing to have GALBET CORP. pay for such conveyance by the surrender of a part of the stock each of such persons holds and by the issuance of the said stock by GALBET CORP. to STEINMETZ and the persons he represents. NOW THEREFORE, * * * it is agreed as follows: 1. Simultaneously with the execution of this agreement, STEINMETZ has delivered a deed to the premises described in Schedule "A" 14 and made part hereof to GALBET CORP., receipt of which deed is herewith acknowledged by GALBET CORP. * * * Said conveyance and deed is subject to a first mortgage now a lien of record * * * and is also subject to tenancies in buildings contained therein. * * * All other liens, however, on the premises so conveyed by the persons represented by STEINMETZ for the purposes of this agreement shall be considered and are herewith declared to be solely the obligations of STEINMETZ and the aforesaid persons he represents and are to be dealt with as more particularly set forth hereinafter in paragraph 5. * * * 4. STEINMETZ and LEVIN agree for and on *89 behalf of the respective persons they represent that the conduct of the corporate affairs of GALBET CORP. shall be governed as follows: (a) That the persons represented by LEVIN are hereby designated Group A, and the persons represented by STEINMETZ are hereby designated Group B and LEVIN and STEINMETZ agree for and on behalf of both groups that Group A shall have the right and privilege to select and elect 50% of the directors of the corporation, and Group B agrees to vote its stock for such directors selected by Group A, and conversely, Group B shall have the right and privilege to select and elect the remaining 50% of the Board of Directors of GALBET CORP. and Group A agrees to vote their stock for the 50% of the directors so selected by Group A. * * * 15 5. In the event that after the date of this agreement a condemnation of the fee of the corporation shall occur, it is agreed that the proceeds of the award made in such condemnation proceeding shall be divided between Groups A and B, as follows: (a) The First $35,000.00 of said proceeds are hereby allocated and shall be paid to Group A without any charge or claim thereupon, or any right therein on the part of Group *90 B free and clear of the claims of any mortgagee, and Group B does hereby agree, consent to, authorize and approve payment by GALBET CORP. of said first $35,000.00 to Group A when received; the balance of said award shall be paid in proportion to their respective stockholdings as adjusted, * * * It is the intention of this provision that Group A shall pay and satisfy all mortgages and liens as the same are set forth in Schedule "C" [the parcel owned by Galbert Corp.] annexed to this agreement and that their share of the awards in condemnation shall be charged therewith and that Group B shall pay and satisfy all mortgages and liens against the premises described in Schedule "A" annexed to this agreement. (b) Group A, upon receipt of the aforesaid sums of $35,000.00, $3,500.00, and its share of the award in condemnation, as hereinbefore provided, shall thereupon surrender all of the stock held by the members of said group to GALBET CORP. simultaneously with the receipt of the aforesaid payments and all of the persons comprising Group A shall thereupon resign any and all officers [sic] or directorships any of the said persons may hold in GALBET CORP. 16 6. Group A hereby *91 indemnifies and agrees to save harmless Group B of and from any and all claims, payments, losses, or liabilities which GALBET CORP. may suffer, incur, or be liable for the payment thereof for any reason whatsoever up to the date of this agreement, it being the intention of this provision that Group A shall save Group B free and harmless from any claims against GALBET CORP. up to the date of this agreement * * *; conversely, Group B hereby agrees to indemnify and save harmless Group A of and from any and all claims, payments, losses, liabilities, or judgments, which the individuals of Group A may suffer, or incur, or be liable for the payment thereof for any reason whatsoever up to the date of this agreement, it being the intention of this provision to save Group A free and harmless from any claims against the individuals comprising Group B * * *. * * * /s/
Milton Levin /s/
Max Steinmetz CONSENTED AND AGREED TO: GALBET CORP. By: /s/Milton Levin - President 17 By Bargain and Sale Deed dated May 24, 1960 and recorded in the office of the New York City Register, Queens County, New York on July 1, 1960, Louis Steinmetz, Max Steinmetz and Edith Steinmetz conveyed their *92 real property to Galbet Corp. By document dated June 14, 1960, Parsons Parking Terminals, Inc., assigned the prime lease to Galbet Corp. As of that date, Galbet Corp., which then owned the entire lease, had an adjusted basis in the leasehold of $36,500. The second agreement, also dated May 24, 1960, but actually drawn at a later date, provided, in pertinent part: WHEREAS, LEVIN and STEINMETZ have this day entered into an agreement; and WHEREAS, both LEVIN and STEINMETZ desire to supplement and to implement the agreement this day entered into by and between them; * * * it is further agreed as follows: 1. In the event that title shall not vest in the city of New York, or in any of its agencies or authorities entitled to take property by emminent [sic] domain on or before the 31st day of December, 1960, either 18 party hereto shall have the option to cancel the agreement heretofore entered into between them this day. In the event that either party cancels the aforesaid agreement by giving notice to the other in writing by registered mail, the parties hereto shall cause the following to occur: If Steinmetz cancels, STEINMETZ shall surrender or shall cause to *93 be surrendered to GALBET CORP., all of the stock heretofore issued to GALBET CORP. to the persons he represents and LEVIN agrees, upon receipt of said stock and simultaneously therewith, to cause GALBET CORP. to reconvey to STEINMETZ, or his designees, all of the premises described in Schedule "A" of the agreement heretofore entered into with STEINMETZ. If LEVIN cancels, then LEVIN agrees to cause GALBET CORP. to reconvey to STEINMETZ, or his designees, all of the premises described in Schedule "A" of the agreement between STEINMETZ and himself and simultaneously therewith, STEINMETZ shall cause to be surrendered to GALBET CORP. all of the stock of GALBET CORP. held by STEINMETZ, or the persons he represents and simultaneously with the aforesaid conveyance and delivery of stock as hereinabove described, and regardless of which party shall elect to terminate this agreement, LEVIN shall cause GALBET CORP. to enter into and execute and deliver to STEINMETZ, or his designees, a new lease for and of the premises described in Schedule "A" of the prior agreement upon the same terms, conditions and form as the original lease contained, together with all prior amendments and modifications *94 thereof as the same existed prior to the conveyance of the premises described in Schedule "A" of the agreement between STEINMETZ and LEVIN. * * * 19 2. On June 14, 1960, Galbet Corp. and Levin entered into an agreement with Parsons Parking Terminals, Inc., which agreement was witnessed by Max Steinmetz and is made part hereof. Steinmetz hereby ratifies and adopts each and every term of that agreement on the part of Levin and Galbet Corp. to be performed thereunder as and for the obligation of Steinmetz and Steinmetz agrees for an on behalf of himself, Louis and Ethel Steinmetz to be co-indemnitors and co-guarantor with Levin as to all of the obligations and as to the discharge of all of the liabilities required to be made or paid by Levin and the persons Levin represents under the said agreement with Parsons Parking Terminals, Inc. in the same proportions and to the same extent as is provided for the sharing of any awards in condemnation to which this agreement is supplementary thereto and the parties do hereby agree one with the other to adjust and settle payment of all sums of money whatsoever required or received pursuant to the terms and conditions hereof. 3. The *95 parties hereto further agree with each other that all of the assets of Galbet Corp. shall be conveyed to West Shore Martin, Inc., a New York corporation organized and existing under the laws of the State of New York, immediately upon the amendment of the certificate of incorporation of West Shore Martin, Inc., so as to convert said corporation into a [sic] Article 9 Corporation, under the stock corporation law of the State of New York, rather than as it is constituted as an Article 2 Corporation. That simultaneously with the transfer of the assets of Galbet Corp. 20 to West Shore Martin, Inc., as hereinabove provided, West Shore Martin Inc. shall issue shares of stock to Group A and to Group B, as in this agreement contemplated, and simultaneously therewith Group A and B shall surrender any stock owned in Galbet Corp. to Galbet Corp. in order to effectuate the arrangement hereinbefore provided and simultaneously with the issuance of said stock, all instruments contemplated to be recorded and to be exchanged by this agreement and the agreement which this supplements, shall be delivered, recorded and executed as may be provided for herein. 4. The parties agree that all *96 of the obligations required to be performed and discharged by Galbet Corp. with respect to the stockholders and Galbet Corp. and to the parties in this agreement shall be binding upon and shall be discharged and performed by West Shore Martin, Inc. to the stockholders thereof and this agreement shall be binding upon all of the heirs, legal representatives, successors and assigns of the parties hereto and any of their designees, nominees or successor corporations. IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, the day and year first above written. /s/
Milton Levin
/s/
Max Steinmetz
Agreed and Accepted to: GALBET CORP. By: /s/
Milton Levin, President. 21 West Shore was a dormant corporation that had been organized by Milton Levin in 1959, but had never issued any stock, owned any assets, transacted any business, or been used for any other purpose. The real property owned in fee by Galbet Corp. was conveyed to West Shore Martin, Inc. on June 29, 1960. On the same date, Galbet Corp. ceased operating as a corporate entity without formally liquidating. The balance of its assets, together with all of the liabilities, were taken *97 over at book value by the individuals comprising the "Levin group" under the name "Jamaica Parking Lot, Tenants-in-Common." Notwithstanding that the assets and liabilities of Galbet were never formally assigned to the individuals then operating the parking lot as tenants in common, after June 29, 1960, all the income and expenses attributable to the real property previously owned by Galbet and conveyed to West Shore were accounted for by and reported on the income tax returns of the individuals comprising "Jamaica Parking Lot, Tenants-in-Common." 22 Galbet was dissolved by Proclamation of the Secretary of State of New York on December 15, 1967. Subsequent to the transfer, on May 24, 1960, of the real property owned by Louis and Ethel Steinmetz, they accounted for and reported on their individual income tax returns all of the income and expenses attributable to such property. By resolution dated July 28, 1960, the Board of Estimate of the City of New York, approved the acquisition of the subject parcels for municipal parking purposes. On March 13, 1961, title to the two parcels vested in the City of New York upon the entry of the order of the Supreme Court, Queens *98 County, granting the application to condemn pursuant to the Administrative Code of the City of New York. 23 Pursuant to an order of the court directed to the Corporation Counsel of the City of New York, advance payments for the condemnation proceeding were made as follows: Payee
Amount of Payment
Dates of Payment
Warrant Numbers
West Shore Martin, Inc.
$47,693.87
8/14/62
177521
177525
City Collector
9,402.39
8/14/62
177526
Pauline Reisman
9,533.02
10/10/62
177527
Samuel D. Rappaport
22,431.11
8/15/62
177528
Harry L. Rappaport
22,431.12
8/15/62
177529
Sylvia Kriegel
7,477.04
8/16/62
177530
Shirley Scheuer
7,477.04
8/15/62
177531
Robert Kriegel
7,477.04
8/15/62
177532
Carlton Supply Co., Inc.
26,300.14
8/17/62
177533
Connecticut Mutual Life
Insurance Company
46,327.23
8/21/62
177534
Total
$206,550.00
On May 17, 1963, an interim award in the net amount of $273,055.60, comprising a gross amount of $404,585.31, less credits of $131,529.71 was made payable to West Shore Martin, Inc. on account of the condemnation proceedings. 24 On July 3, 1963, the final award on account of the condemnation proceeding *99 was paid as follows: Payee
Warrant No.
Amount of Payment West Shore Martin, Inc.
147257
$25,000.00
West Shore Martin, Inc.
147258
25,000.00
West Shore Martin, Inc.
147259
5,000.00
West Shore Martin, Inc.
147260
41,647.14
Total
$86,647.14
Prior to August 14, 1962, the date of the first payment by the City of New York, West Shore had no bank account. On that date an account was opened at the Marine Midland Trust Co. in the name of West Shore Martin, Inc. with an initial deposit of $44,693.87. [4] Subsequent deposits to the account consisted solely of further payments on the condemnation award and returns of amounts previously withdrawn. Disbursements from the bank account were made for fees and expenses solely related to the condemnation, a few exchanges, and distributions of the condemnation proceeds to the principals. 25 At no time did West Shore Martin, Inc. collect any income from, or pay any expenses of, the operation of either of the subject parcels. The total award paid *100 by the City of New York for the condemnation of both parcels was $652,500. The respective petitioners received the following amounts in distribution as a result of the condemnation award: Docket No.
Name
Amount 3978-69
Louis Steinmetz
$299,403
3987-69
Estate of Benjamin Weir, Deceased
33,000
4000-69
Milton Levin
32,064
4001-69
Maurice Gruber
24,189
4002-69
Estate of Harry Liebowitz, Deceased
28,127
4004-69
Nathan Slewett
14,063
4007-69
Trust Under Will of Eli Miller, Deceased, Nathan Slewett, Trustee
23,205
4008-69
Estate of Eli Miller, Deceased
45,002
The amount actu The amount actually due to the Estate of Benjamin Weir, Deceased, was $67,504 rather than the $33,000 actually received. The amount was reduced in settlement of all outstanding claims between Benjamin Weir, now deceased, and the other individuals comprising the Levin group. 26 The amount of $23,205 received by the Trust Under the Will of Eli Miller, Deceased, docket No. 4007-69, was paid it by the Estate of Eli Miller, Deceased, docket No. 4008-69. OPINION Louis and Edith Steinmetz owned real property adjoining that owned by Galbert Corp. located in Jamaica, *101 Queens, New York. In May 1956, the Steinmetzes leased all of their real property, together with all buildings and improvements, to Parsons Parking Terminals, Inc. On May 1, 1958, Galbert acquired from Parsons a sublease on the property. During 1958 and 1959, frequent newspaper articles appeared indicating that the two adjoining parcels might be taken by condemnation by the City of New York for either a new library or a municipal parking field. Max Steinmetz sought legal assistance from Romano and Schenker, a law firm specializing in condemnation law, who advised him to attempt to create an identity of interest in the two parcels in order to enhance the amount of the award. 27 On May 4, 1960, the New York City Planning Commission formally adopted a resolution recommending the acquisition of the two adjacent properties, together with all buildings and improvements thereon. Shortly thereafter, the parties entered into two agreements, each dated May 24, 1960. The first such agreement called for the Steinmetzes to convey the fee in their property to Galbet in exchange for stock of Galbet surrendered by the stockholders thereof, which was then reissued to the Steinmetzes. *102 By Bargain and Sale Deed dated May 24, 1960 and recorded in the office of the New York City Register on July 1, 1960, the Steinmetzes conveyed their real property to Galbet. On June 14, 1960, Galbet acquired from Parsons Parking Terminals, Inc., a lease Parsons had previously obtained from the Steinmetzes. The second agreement provided for all of the assets of Galbet Corp. to be assigned to West Shore Martin, Inc., the option for either group to cancel the agreements if title did not vest in the City of New York, and the ratification of the lease assignment. 28 On June 29, 1960, Galbet transferred the real property it then owned to West Shore, distributed its remaining assets to its previous shareholders without formally liquidating, and ceased operating the parking lot. Each of the former individuals operated the respective properties previously owned by them in the same manner as they had prior to the transfer of legal title to West Shore, accounting for the income and expenses incident thereto and reporting them on their individual income tax returns. On July 28, 1960, the Board of Estimate of the City of New York approved the acquisition of the real property *103 held by West Shore Martin, Inc. Title to such property vested in the City of New York on March 13, 1961. Payments on the condemnation award were received by West Shore Martin, Inc. and deposited to a checking account opened for the purpose of receiving such payments and making distributions thereof to the principals, who reported the income from the condemnation on their individual income tax returns. 29 In his determination of deficiencies and transferee liability against the petitioners herein, respondent has asserted that West Shore Martin, Inc. was a viable corporate entity, taxable on the proceeds of the condemnation. West Shore's shareholders, he contends, are liable as transferees of the award. The petitioners, on the other hand, while admitting that they are liable as transferees if West Shore was taxable on the condemnation award, deny that West Shore was anything more than a mere nominee holding naked legal title to the properties. Therefore, they argue, West Shore is not taxable on the proceeds of the condemnation. Initially, we are thus faced with deciding whether West Shore Martin, Inc. was, in 1963, an entity for tax purposes. That *104 determination is essentially one of fact, to be made from an examination of all the circumstances of the particular case. Notwithstanding the factual nature of the issue, the parties have cited numerous authoritative cases in support of their respective positions. 30 The respondent rests his case principally on Moline Properties v. Commissioner, 319 U.S. 436 (1943). However, that case is inapplicable to the facts before this Court. The practice of utilizing a nominee to hold bare legal title to real property for the purpose of convenience is not subject to question. Where the title vests in a corporation, which serves no other purpose than to hold title, the corporate entity may be disregarded for tax purposes. O'Neill v. Commissioner, 170 F.2d 596 (C.A. 2, 1948); Paymer v. Commissioner, 150 F.2d 334 (C.A. 2, 1945); John A. Mulligan, 16 T.C. 1489 (1951); and Archibald R. Watson, 42 B.T.A. 52 (1940), affirmed on other issues 124 F.2d 437 (C.A. 2, *105 1942). West Shore Martin, Inc. was no more than an inactive nominee utilized as a "front" to hold bare legal title to two parcels of realty for a relatively short period of time. It engaged in no "business" within the common sense meaning of that term. See 31 Jackson v. Commissioner, 233 F.2d 289, 291 (C.A. 2, 1956). At all times, the beneficial ownership of the two properties rested in the individual participants. [5] The income and expenses of the properties were chargeable to those participants. David F. Bolger, 59 T.C. 760 (1973), on appeal (C.A. 3, Aug. 13, 1973). Respondent has recognized the economic realities of this case. He made no claim herein that the rental income or the income from the operation of the parking lot should also be taxed to the corporation which held legal title to the properties. He made no such adjustments to the liabilities of the individuals who reported those items on their personal returns. He did not contest the fact that the properties were managed entirely by the individuals, not by *106 the corporation. As was stated in John A. Mulligan, supra, at page 1492, "we think the facts demonstrate that this situation falls in that numerous group where the holding of bare legal title to real property is found to be an insufficient ground for taxing income to a corporation having no other function." 32 Since we have concluded that West Shore Martin, Inc. was not taxable on the proceeds of the condemnation award, the subsidiary issues presented for consideration are moot. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioner are consolidated herewith: Louis Steinmetz and Ethel Steinmetz, docket No. 3979-69; West Shore Martin, Inc., docket No. 3980-69; Estate of Benjamin Weir, Deceased, Joseph Goldstein, Executor, docket No. 3987-69; Estate of Benjamin Weir, Deceased, Joseph Goldstein, Executor, and Rose weir, docket No. 3988-69; Milton Levin, Transferee, docket No. 4000-69; Maurice Gruber, Transferee, docket No. 4001-69; Estate of Harry Liebowitz, Deceased, Jerry Liebowitz, Executor, and Harry Schwartz, Executor, Transferee, docket No. 4002-69; Estate of Harry Liebowitz, Deceased, Jerry Liebowitz and Harry Schwartz, Executors, and Estate of Jennie Liebowitz, Deceased, Jerry Liebowitz, Executor, docket No. 4003-69; Nathan Slewett, Transferee, docket No. 4004-69; Nathan Slewett and Evelyn Slewett, docket No. 4005-69; Trust Under the Will of Eli Miller, Deceased, Nathan Slewett, Trustee, of Eli Miller, Deceased, Nathan Slewett, Trustee, Transferee, docket No. 4007-69; Estate of Eli Miller, Deceased, Nathan Slewett, Executor, Transferee, docket No. 4008-69; and Estate of Eli Miller, Deceased, Nathan Slewett, Executor, docket No. 4009-69. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. The petitioners in docket Nos. 3978-69, 4000-69, 4001-69, 4002-69, 4004-69, and 4008-69 have conceded that they are liable as transferees for any deficiency and addition to the tax determined to be due from West Shore Martin, Inc., the petitioner in docket No. 3980-69. The petitioner in docket No. 3987-69 also has conceded the liability as a transferee, but the amount of such liability remains in dispute. The petitioners in docket Nos. 3979-69, 3988-69, 4003-69, and 4005-69 have conceded that if West Shore Martin, Inc., is a taxable entity, they were in receipt of liquidation distributions from such corporation in 1963. Respondent has conceded that the amount of such distributions as set forth in the statutory notice of deficiency should be proportionately reduced by the amount of any tax, penalty, and interest determined to be due from West Shore Martin, Inc. The petitioner in docket No. 4007-69 has conceded that it is liable as a transferee of a transferee of amounts determined to be due from West Shore Martin, Inc. Respondent has conceded that the amount of such liability, if any, is limited to $23,205. Respondent has also conceded that there is no income tax deficiency due from the petitioner in docket No. 4009-69 and that there is no transferee liability due from the petitioner in docket No. 4006-69. ↩
4. The disparity of $3,000 between the amount of the advance payment to West Shore and the initial deposit to its bank account has not been explained. ↩
5. See Kurtz & Kopp, "Taxability of Straw Corporations in Real Estate Transactions," 22 Tax Lawyer 647↩ (1969).